HENRY L. BOWEN,

*vs.*

IMPERIAL THEATRES, INC., a corporation of the State of Delaware

*New Castle, Feb. 8, 1922.*

As, under *General Corporation Law,* § 9 (*Revised Code* 1915, § 1923) the members of the executive committee of a corporation are chosen from the board of directors, the record of one's election as a member of the executive committee is evidence that he acted as director, though no minute of his election as director appears.

Under *Constitution, Article* IX, § 3, prohibiting the issuance of corporate stock, except for money paid, labor done, or property actually acquired an engagement to render future services to a corporation as director and secretary, or the lending of one's name to the corporation, is not a sufficient consideration for the issuance of full-paid, nonassessable stock.

Assuming that one's engagement to perform future services for a corporation as director and secretary, and to lend it his name, is a lawful consideration for stock, under *Revised Code* 1915, § 1928, making the judgment of the board of directors as to the value of labor or property conclusive, and *Section* 1935, relative to stock subscriptions and payments thereon, a corporation was en-

titled to the benefit of the judgment of all the directors as to the fairness of such consideration.

Under *Constitution, Article* IX, § 3, stock of the par value of twenty-five thousand dollars was not legally issued as full-paid and nonassessable, where the only consideration was a promise to pay three hundred and fifty dollars therefor.

It was a fraud on a corporation and its other stockholders, and a clear breach of trust for the active directors of the corporation to vote to issue to themselves without consideration sufficient stock to give them fifty-one per cent. of all of the stock.

Where directors of a corporation fraudulently issued stock to themselves without consideration, a recital on the face of the certificate that the stock was full-paid and nonassessable did not estop the corporation from denying its truth; the statement being regarded as made by the directors themselves.

If stock issued as full-paid and nonassessable was in fact illegally issued, and a transferee of the stock knew such fact, or had such notice as would in equity attribute knowledge to him, he cannot compel the issuance of a new certificate, which would necessarily state that the stock is full-paid and nonassessable.

A corporation is estopped from denying a recital in a stock certificate that the stock was full-paid and nonassessable, as against one purchasing for value without notice of the infirmity in the holder's title, or without knowledge sufficient in law to impute notice to him.

A purchaser of stock issued without consideration, who had notice, while negotiating for its purchase, that the company had attempted to cancel the stock and that its attorney had pronounced its issuance illegal, and in negotiating for the purchase of other stock issued under the same circumstances, was warned that there would be no refund if the stock proved worthless, and was permitted to see the resolution of the directors providing for the issuance of part of the stock and consulted counsel concerning the legality of its issuance, was at least put on inquiry as to the defect in the stock.

If a purchaser of stock issued without consideration learned that it was so issued during the time intervening between the agreement to purchase and the actual purchase, he purchased at his own risk, as the seller could not perform his part of the contract, and would have had no possible claim against the purchaser for breach of contract.

That a purchaser of stock, learning before he completed the purchase by paying the price, that it was issued without consideration, had bargained to sell some of the stock to other parties, could not authorize him to complete the purchase otherwise than at his own risk.

In a suit by a transferee of stock issued without consideration to compel the issuance to him of a new certificate, where the original holder of the stock

was not a party, the court could not decree a cancellation of the certificate' though the parties stipulated that this might be done if the decree was for defendant, as no decree could be made adversely affecting the original holder's interests.

BILL TO COMPEL TRANSFER OF STOCK. The bill charges that the complainant had purchased twelve thousand six hundred and fifty shares of common stock of the defendant corporation from one F. S. Stover, who possessed stock certificate No. 398 of the company evidencing that Stover was the owner of said number of shares. After making the purchase of the shares and securing from Stover a transfer of the certificate, the bill charges that complainant presented the certificate to the company with the request that the shares be transferred to his name on the books of the company and that a new certificate be issued to him. The company refused to make the transfer on the ground that the issuance of the shares to Stover had been illegal and that, since the issuance thereof, the shares so standing in Stover's name had been canceled, and that complainant had notice of these facts before making the purchase.

The defendant filed a cross-bill praying that the court decree the stock to have been illegally issued to Stover, and that stock certificate No. 398 be delivered up to the company for cancellation. The cross-bill was never pleaded to issue. The parties to the cause, however, entered into a stipulation that the cross-bill should be dismissed without prejudice; that the certificate should be deposited with the register of this court, and, in case the decree should be in favor of the defendant company, it should contain an order for the cancellation thereof.

The case was heard on bill, answer and testimony of witnesses heard orally before the Chancellor.

*Percy Warren Green* for the complainant.

*James H. Hughes, Jr.*, of the firm of Marvel, Marvel, Layton & Hughes, for the defendant.

THE CHANCELLOR. The defendant based its refusal to issue a new certificate of stock to the complainant on the ground that the shares evidenced by the certificate had been illegally issued to F. S. Stover, the complainant's transferor, and now resists the

prayers of the bill on the same ground coupled with the further essential averment that the complainant, when he purchased from Stover, had notice of the infirmity in Stover's title to the stock.

This requires that I first pass upon the legality of the stock in Stover's hands, and then, if it be found that the issue to him was illegal, that I examine the further question of whether the complainant had such notice of the fact as will defeat his right to a decree.

The company was organized in November, 1920, with an authorized capital of one hundred thousand shares of the par value of five dallars each. Its directors were Charles L. Kress, William Hallam, Jr., and John B. McDonough. Kress became president, Hallam became vice-president, and McDonough became secretary and treasurer. On November 27, 1920, McDonough resigned as secretary and apparently thereafter took no active part in the affairs of the company. On that same date, Stover was elected secretary, and later became assistant treasurer and also treasurer.

The witnesses, including Stover, testified that Stover became a director of the company. I fail to find any minute of his election as director in the book in which the minutes were supposed to be recorded. This book was, as appears from a mere casual inspection, very carelessly kept. Stover, however, acted as director. This appears not only from the testimony of witnesses, but as well from the fact that the minute book records his election as a member of the executive committee, whose members are chosen from the board of directors. *Section 9, General Corporation Law (Revised Code* of 1915, § 1923). His election to the executive committee occurred on December 15, 1920. The other members of this committee were Kress and Hallam. So it appears that as early, at least, as December 15, and thereafter, Kress, Hallam and Stover were members of the board of directors, and at the same time constituted the executive committee.

The certificate for  twelve thousand six hundred and fifty shares of stock of the defendant company, being No. 398, which complainant seeks to compel the company to transfer to his name on the books of the company, was issued to Stover May 13, 1921. This number of shares is what remained in Stover's name after the transfer by him of a small amount out of two prior issues to him

of five thousand shares and seven thousand seven hundred and seventy-five shares evidenced respectively by certificates numbered five and nineteen.

Certificate No. 398 is for twelve thousand six hundred and fifty shares of stock "full-paid and not subject to further calls or assessments."

The Constitution of this state provides that no corporation may issue stock except for money paid, labor done or personal property or real estate, or leases thereof actually acquired by the corporation. *Article* 9, § 3. The statute (*Revised Code* of 1915, *c.* 65, § 14, *par.* 1928, *p.* 924) provides that the judgment of the board of directors as to the value of such labor, etc., shall be conclusive in the absence of actual fraud.

The defendant contends that the issuance of the two blocks of stock to Stover was illegal, in that they were fraudulently issued by the then directors of the company without the payment of lawful consideration therefor, and that the designation of them in certificate No. 398 as full-paid and nonassessable is, therefore, false.

The records of the corporation throw no light on the circumstances attending the issue to Stover of the first block of five thousand shares evidenced by certificate No. 5. Stover testified that these shares were issued to him in consideration of his agreeing to become a director and secretary of the company and lending to it his name. If this statement be taken as true, then the five thousand shares issued to Stover were issued without consideration. Engaging to render future services cannot, under such a constitutional provision as we have, defining the things for which stock may be issued, be taken as consideration for the issuance of full-paid, nonassessable stock. *Cooney Co. v. Arlington Hotel Co.*, 11 *Del. Ch.* 286, 306, 101 *Atl.* 879; *Scully v. Automobile Finance Co.*, 12 *Del. Ch.* 174, 109 *Atl.* 49; *B. & C. Electrical Construction Co. v. Owen*, 176, *App. Div.* 399, 163 *N. Y. Supp.* 31. Nor can Stover's lending of his name to the corporation be held to constitute a lawful consideration. The directors do not appear, at least by the minutes of the corporation, to have valued Stover's name. Nor is there any evidence before me showing what value, if any, this name had, except Stover's own statement that it could not be bought

for five thousand dollars. I am compelled to say, however, that I do not attach much importance to Stover's self appraisal. What might be the view of the court upon the question of valuable consideration, if evidence were produced tending to show that a certain individual's name is in fact a great asset, I need not say. Certainly, in the absence of a showing to the contrary, better than appears in this case, this court will not indulge the extraordinary presumption that an individual's name is property for the "lending" of which full-paid stock may be issued under the Constitution of this state. Indeed, I am disposed to think that what Stover meant when he testified about "lending my name" was nothing more than consenting to become connected with the company. If this be true, then it amounts to no more than agreeing to render services in the future as the company's secretary. But this, as before stated, does not constitute a lawful consideration. The more so is this true in this case, because the evidence shows that Stover was to be paid a salary to serve as secretary, and was, in point of fact, actually so paid.

But if Stover did as a fact receive the five thousand shares for agreeing to become a director and the company's secretary and to lend to it his name, as he testified, another consideration presents itself as tending at least to impeach the transaction. I refer to the fact that, assuming the consideration he describes to be lawful one, yet the directors do not appear ever to have valued the future services and the present name of Stover. While the statute (*Revised Code of* 1915, *c.* 65 § 14, *par.* 1928, *p.* 924) does not in terms require that the directors shall place a value on labor done and property acquired as a consideration for the issuance of stock, yet it would seem that they must; not only because of other provisions of the *General Corporation Law*, notably *Section* 21 (*Revised Code of* 1915, *par.* 1935), but as well because where the value of a thing is not self-evident the judgment of some one must be consulted, and the directors of the corporation are the persons upon whose judgment the corporation would naturally rely.

The statute does not, however, require that this judgment shall be formally recorded. Whether a formal resolution valuing the labor done, etc., should be presented, adopted and formally

recorded in the minutes (as is usual in such matters), I need not decide. The truth is that in a matter of this importance, the minutes of the directors of this corporation are silent. I take it as a fact in this case, that the directors never did pass judgment on the value of Stover's services and of his name, not only because of the silence of the minutes, where we generally look for evidence of the acts of the directors, but more because of the uncontradicted testimony of Kress, a director of the company, to the effect that the arrangement to give Stover five thousand shares was made, not with the company, but with Kress and Hallam, two directors. McDonough, the other director, had no part in the transaction. Waiving all questions concerning the informality of the transaction, the company was entitled in any event at least to have the opportunity afforded to its director, McDonough, to bring to the proposed bargain the benefit of his judgment in conjunction with that of his codirectors upon the fairness of the consideration which the company was to receive for its stock. *Lippman v. Kehoe Stenograph Co.*, 11 *Del. Ch.* 80, 87, *et seq.*, 95 *Atl.* 895.

Kress and Hallam, in their testimony, do not agree with Stover concerning the consideration for which the five thousand shares were issued to the latter. They were the directors who made the arrangements with Stover for his employment. It appears that they advertised for a secretary and Stover responded to the advertisement. They testify that Stover was to become secretary at a salary, receive five thousand shares of stock, and put into the company the sum of three hundred and fifty dollars, the amount which each of them had "put in," as they termed it. Stover received the five thousand shares, but never "put in" a dollar. The company, therefore, according to their account of the matter, has never received anything for Stover's original five thousand shares. I need not discuss the question of whether a promise to pay money for stock constitutes a sufficient consideration under the constitutional provisions above referred to, for Stover, the complainant's transferor, denies that he was to pay money, and, secondly, if Kress and Hallam, who contradict him, are to be believed, he was not to pay at the most more than three hundred and fifty dollars for the twenty-five thousand dollars par value which he received.

In any aspect of the case, therefore, the five thousand shares issued to Stover was not stock "full-paid and not subject to further calls or assessments," as is recited on the face of the present certificate, which the complainant seeks to have transferred to his own name.

The remaining shares standing in Stover's name were received by him on January 11, 1921. On that date he received certificate No. 19 for seven thousand seven hundred and seventy-five shares, of the par value of $38,875. On that date there was a meeting of the board of directors at which a motion was adopted, as a result of which certificate No. 19 was issued to Stover. The directors present at the meeting were Kress, Hallam and Stover. Several questions have been raised with respect to the legality of that meeting and the validity of the proceedings there taken. But these questions I pass over, preferring to rest my decision not on the legality of the call for the meeting, but upon the action taken thereat.

The three directors just named met about noon on January 11, 1921, in special session and, having adjourned, met in regular session at a later hour of the same day. The object of the special meeting as set forth in the call, was to increase the number of directors to seven. I find no entry in the minutes indicating that the special business mentioned in the call was ever broached. The directors, however, did adopt the following motion:

"That the following persons hold and receive fifty-one per cent. of the total capitalization of the Imperial Theatres Corporation for their services and moneys expended and that all former stock issued to the following persons shall be canceled and fifty-one per cent. reissued: Mr. Chas. L. Kress, Wm. Hallam, Jr., F. S. Stover."

It was in pursuance of this action that Stover secured the remainder of his stock, to-wit, seven thousand seven hundred and seventy five shares evidenced by certificate No. 19.

When asked to explain what services he had rendered and what moneys he had expended for the $38,875 additional stock which was so voted to him, his testimony was far from satisfactory. Stover, in his testimony, attempted to justify the resolution of January 11, 1921, by showing moneys expended and services rendered in addition to those he was regularly employed to render.

But Kress and Hallam, the other two directors, make no such attempt. They, with Stover, were equally the beneficiaries of the resolution of January 11, 1921, and their explanation of why it was adopted gives to it a color entirely different from that which Stover gives to it. I might analyze the testimony of Stover, and demonstrate, at least to the court's satisfaction, why, even on Stover's account of the matter, the seven thousand seven hundred and seventy-five shares issued to him cannot be held to have been legally issued as full-paid and nonassessable stock. But this is unnecessary, for I prefer to accept the account of the matter given by Kress and Hallam. That account discloses that the resolution was adopted in pursuance of a plan which was of such character as to vitiate the resolution as a fraud on the company and its other stockholders.

This plan, briefly stated, was that the directorate of the corporation should be increased in number; that the additional directors should be elected and the board so augmented should meet in session at three o'clock on January 11, 1921; but that, in order to secure control of the corporation to themselves, the three members of the old board (Kress, Hallam and Stover) should meet at an earlier hour and vote a majority of the stock to themselves; that this plan was suggested by Stover; and that it was for this reason that the resolution was adopted. Kress and Hallam testified, that none of the three gave anything for their stock and that the same was, in the manner described, issued without any consideration whatever.

I accept their account of the transaction as expressive of the truth. This being so, a gross fraud was perpetrated on the company and its other stockholders. The fraud is more aggravated in nature by reason of the fact that the active directors of the corporation made themselves the beneficiaries of their own wrongful acts. Directors of a corporation are frequently spoken of as its trustees. Their acts are scanned in the light of those principles which define the relationship existing between trustee and *cestui que trust*. Tested by these familiar principles, the three directors who thus conspired to take from the company enough stock to fix themselves in undisputed control of its affairs, is reprehensible.

It is contended by the defendant that, even if they had given

value for the stock, but if their purpose had been to secure control of the company, the issuance of the stock to themselves, notwithstanding they had paid full value, would have been subject to attack by stockholders who had thus been deprived of their pre-emptive right to subscribe to the new issue. This, I think, is true. *Trask v. Chase*, 107 *Me.* 137, 77 *Atl.* 698; *Luther v. Luther Co.*, 118 *Wis.* 112, 94 *N. W.* 69, 99 *Am. St. Rep.* 977; *Elliot, et al., v. Baker, et al.*, 194 *Mass.* 518, 80 *N. E.* 450. The more so would it be true where the directors issue the additional stock for an inadequate consideration as in *Way v. American Grease Co.*, 60 *N. J. Eq.* 263, 47 *Atl.* 44.

But I am not so much concerned with this principle in the present case, for, if value had been paid, there may be circumstances in connection with the affairs of this corporation which would render the principle inapplicable, or at all events deprive it of much of its force; because, in this case, there was no struggle between rival factions for the control of the company as there was in the cited cases. The concern of everybody interested at the time seems to have been to sell the company's stock. The identity of the purchasers does not appear to have been of moment. And in the instant case no stockholder is complaining because his pre-emptive right to subscribe was denied him.

However this may be (and I decide nothing with respect to it), the material and controlling circumstance is that the directors in whose control the company's stock was vested as its trustees, gave it to themselves for nothing in pursuance of a deliberate plan to retain control over its affairs. This was a clear breach of trust. The stock so taken was marked as full-paid and nonassessable. That the company is estopped under these circumstances from denying the truth of the recital to this effect on the face of the certificate, is in effect to say that the officers who themselves thus fraudulently marked the certificate may rely on their own statement as a complete defense to their fraud; for, though as a matter of form, the statement that the stock was full-paid and nonassessable is the company's statement, yet, as a matter of fact, under the circumstances shown, the statement is to be regarded as made by the directors themselves. They cannot, in violation of their trust, take action which profits themselves, and

then by a formula of their own making close the lips of the corporation against future objection.

The court finds as a fact that the shares standing in Stover s name were illegally issued as "full-paid and not subject to further calls or assessments." That being so, what is the result? Was the stock void in the hands of Stover, or only voidable? Did the company have the right to cancel it? Or could the company choose to recognize it as properly outstanding and liable to assessment? These are questions which I do not feel called upon to discuss, for they do not call for an answer in the pending proceeding. The controversy here is solely between Bowen, Stover's transferee, and the company, and presents the question of whether Bowen is entitled as purchaser from Stover to a new certificate for the number and kind of shares now standing in Stover's name on the books of the company. The company may properly raise against Bowen the question of whether the stock which he bought and for which he seeks to compel the company to issue to him a new certificate, is as a matter of fact full-paid and nonassessable stock, as the new certificate if issued would necessarily state. If it is not, and if Bowen knew the fact, or had such notice as would in equity attribute knowledge to him, then he is not entitled to the new certificate. *Grafner v. Pittsburg, N. I. & C. St. Ry. Co.*, 207 *Pa.* 217, 56 *Atl.* 426.

It is, therefore, pertinent to now examine the question of whether the complainant, Bowen, was an innocent purchaser from Stover.

If Bowen did purchase for value without notice of the infirmity in Stover's title to the stock, or without knowledge sufficient in law to impute notice to him, he would be entitled to the relief prayed, for in such case the corporation would be estopped from denying the recital in its certificate to the effect that the stock was full-paid and nonassessable. *Westminister Nat. Bank v. New England Electrical Works, et al.*, 73 *N. H.* 465, 62 *Atl.* 971, 3 *L. R. A.* (*N. S.*) 551, 111 *Am. St. Rep.* 637.

But the proof shows clearly to my mind that the complainant cannot bring himself within the principle just stated. He had notice of the fact that the company had assumed to cancel the very stock which he was negotiating to purchase. His nego-

tiations extended over a period of time from about May 1, 1921, to July 6, 1921. During that time, he was told by witnesses interested in the company that Stover's stock was worthless, and that the company had canceled it. He heard, or must have heard, Stover and Hallam discussing the cancellation, for such discussion took place in his presence. He knew that the attorney of the company had pronounced the issuance of the stock illegal. While he was negotiating for the purchase of Stover's stock he sought also to buy the stock of Hallam, whose stock he knew had been acquired as Stover's had been acquired, and whose stock the company had likewise assumed to cancel. Hallam warned him that if he bought his (Hallam's) stock, there would be no refund to him in case it proved worthless. Complainant said he was willing to take the chance. Hallam went so far as to have his attorney draft a form of memorandum for complainant to sign to the effect that complainant knew that the company had canceled the Hallam stock, because it was issued without consideration and was therefore void. This memorandum was submitted to complainant. The complainant himself admits that he requested that he be allowed to see the minutes of the meeting of January 11, his purpose being to examine the resolution which authorized the issuance of the stock to Stover, viz. the fifty-one per cent. resolution. He was permitted to see the resolution. Furthermore, he himself admits that he consulted counsel concerning the legality of the issue. These circumstances clearly demonstrate that the complainant had notice sufficient at least to put him on inquiry that there was a defect in Stover's stock.

With all these facts before him, complainant chose to go ahead with his purchase. If he cannot now secure from the company a certificate evidencing what he was thus willing to purchase, the fault is his own.

I hold that complainant is not an innocent purchaser for value without notice. He had actual notice of the company's claim that the stock he was about to purchase was illegally issued and that the company had cancelled the same.

It was urged on behalf of the complainant that before he made the actual purchase from Stover, and before he had received any information at all concerning the circumstances

surrounding Stover's stock, he had agreed to buy it, and that whatever notice he subsequently acquired could not now affect his rights. This is on the theory that notice coming to him during the time intervening between the agreement to purchase and the actual purchase, cannot operate against him, because Stover could hold him to his bargain. This is not tenable. 2 *Pom. Eq. Jur.*, (*4th Ed.*) § 750. If at any time before he completed the purchase by paying his money he acquired notice that would operate to fix knowledge upon him, he then purchased at his own risk. He was protected against any possible claim by Stover against him for breach of contract by the fact that Stover could not deliver the consideration agreed to be paid for. The circumstance that the complainant, after he had agreed to purchase, but before he did purchase, had in turn bargained to sell some of the company's stock to other parties, expecting to eventually supply it from the Stover block, cannot alter his situation.

The decree will be in favor of the defendant, dismissing the bill, with costs. Under the stipulation of counsel filed in the cause, it was agreed that, in case the decree should be in favor of the defendant, the court should embody in its decree an order that the certificate in question, now in possession of the register of this court, should be canceled. This the court cannot do, for the manifest reason that Stover is not a party to the cause. Not being a party, no decree can be made adversely affecting his interests, whatever they may be. The decree will, therefore, go no further than to dismiss the bill, with costs against the complainant.

Let a decree be prepared accordingly.