# GEORGE BACICH AND OTHERS v. NORTHLAND TRANSPORTATION COMPANY AND OTHERS.[1]

April 1, 1932.

No. 28,393.

[1]Reported in 242 N. W. 379.

546

*Anson B. Jackson, Sr., Anson B. Jackson, Jr.* and *Victor J. Larson,* for appellants.

*A. L. Janes,* for respondent Northland Transportation Company.

*David E. Bronson* and *Junell, Oakley, Driscoll & Fletcher,* for respondents R. L. Glynn and Eagle Transportation Company.

Wilson, C. J.

Plaintiffs appealed from a judgment after denial of their motion for a new trial.

The suit is by stockholders in their representative capacity for the benefit of the corporation, the Eagle Transportation Company, a Delaware corporation. Any statement appropriately giving the

facts as found by the trial court would extend over 40 pages. Every sentence in the findings is essential to a proper understanding of all the facts and their relation to each other. Interested persons must go to the decision of the trial court, found in the record, for such information. That portion of the record printed, though reduced to narrative form, contains 1,108 pages.

The record discloses that the Eagle Transportation Company was organized in August, 1924, to take over the business of a copartnership operating a small bus business. Until the fall of 1926, when it disposed of its assets to defendant corporation as hereinafter mentioned, it was insolvent and experienced much financial difficulty. Plaintiffs claim their legal rights have been violated in many ways to the wrongful profit of defendants.

They seek to have certain stock issued to R. L. Glynn adjudged void, a sale of assets by the Eagle company to defendant Northland Transportation Company adjudged fraudulent and set aside, that an accounting be had between the Eagle company and Glynn, and that defendant Northland company be decreed to account to plaintiffs for the benefit of the Eagle company, its bona fide shareholders, and creditors.

■ An exhaustive examination of the record leads us to the conclusion that the trial court's findings are supported by the evidence. This conclusion is fatal to many of plaintiff's claims, only a few of which will be discussed.

■ In January, 1925, the company required at least $6,000 in order to continue in business. It had no assets free from liens. It was forced to resort to sale of stock to its then stockholders and their associates. This was unsuccessful. The directors then offered the $100 shares at $25. But the stockholders did not buy. Thereupon and pursuant to the action of the board of directors and with the knowledge of many, if not all of the plaintiffs in this action, and to the knowledge of plaintiffs Paul Maras, Mike Maras, Delmo Befero, John K. Ban, Paul Dosen, and James Theodore, the Eagle company, through W. J. Power, its agent for that purpose, sold to said Glynn 240 shares of its capital stock marked fully paid and nonassessable, for the sum of $6,000, which sum he paid to the com-

pany. That at the time of making such sale to Glynn the stock of the Eagle company had no actual value, and the same was so sold upon the representation that it was treasury stock and Glynn bought in reliance thereon.

The 240 shares so issued to and purchased by Glynn were issued in the name of W. J. Power and were transferred on the stock books of the corporation to Glynn on July 22, 1925. Power voted this stock at stockholders' meetings on February 9, 1925, and February 16, 1925, without objection and with the acquiescence of plaintiffs attending such meetings.

Glynn voted this stock at stockholders' meetings on January 12, 1926, and September 9, 1926, without objection and with the acquiescence of plaintiffs attending such meetings. These meetings were attended by at least 11 of the plaintiffs. The first objection to this stock voting was on September 21, 1926.

But in reliance upon the validity of the 240 shares of stock and believing that the same were the majority of the issue of the capital stock of the Eagle company and therefore the control thereof, Glynn and his wife and his brother-in-law, Victor L. Power, financed the Eagle company by meeting from their own funds its constant operating deficits and providing for its other financial needs. Except for such financial assistance the company could not have continued in business. Just before the purchase of this stock the company had in its treasury only about $4.90 in cash and was unable to meet its payroll and unable to make necessary payments upon the buses purchased or to pay its current bills for gasolene or other supplies. All of this was well known to plaintiffs. The money received from Glynn for the stock made it possible for it to continue in business, and it could not otherwise have continued in business. Plaintiffs now challenge the voting right not only of the 240 shares of stock but also 80 shares issued to Glynn, and two shares of which were transferred to P. M. Glynn. It is also said that the one or two shares, if any were in the name of Hugh McEwan, were not entitled to vote.

The contention that these shares of stock were void and not entitled to vote cannot be sustained. We are now dealing with the

transaction as between Glynn and the corporation only, not the corporation creditors. As between the parties it was valid to sell the 240 shares of the par value of $24,000 at 25 cents on the dollar or $6,000. First Nat. Bank v. Gustin Minerva C. M. Co. 42 Minn. 327, 44 N. W. 198, 6 L. R. A. 676, 18 A. S. R. 510; Hospes v. N. W. Mfg. & Car Co. 48 Minn. 174, 50 N. W. 1117, 15 L. R. A. 470, 31 A. S. R. 637; Shaw v. Staight, 107 Minn. 152, 119 N. W. 951, 20 L.R.A.(N.S.) 1077; State Bank of Commerce v. Kenney B. I. Co. 143 Minn. 236, 173 N. W. 560; Dispatch Printing Co. v. Security B. & I. Co. 154 Minn. 211, 191 N. W. 601; Ewing v. Gmeinder, 170 Minn. 242, 212 N. W. 446.

But it may appropriately be said that we must look to the Delaware law. The trial court held that plaintiffs' contention that 240 shares of this stock were held as collateral was not true. A resolution was voted by the directors in January, 1925, authorizing the sale of this stock at $25 per share to realize $6,000. Five of the plaintiffs were then directors and voted for such resolution. The stock was previously offered to the stockholders for the same price. Glynn relied upon the resolution which was shown him. Whether this stock was in fact treasury stock could not be determined from the inefficient books of accounts and records. For plaintiffs to succeed here they must show prejudice. The facts are that plaintiffs were not prejudiced, but on the contrary were substantially benefited by the sale of this stock, because the corporation was thereby kept alive. All stockholders present, including several plaintiffs, especially George Bacich and Paul Maras, upon whom plaintiffs placed reliance, acquiesced in the voting of these shares without objection until September 21, 1926. This stock stood in the names of the respective owners on the books of the corporation; and, in the absence of a judicial determination that it was invalid, the holder had a right to vote it. Mortgage L. Inv. Co. v. McMains, 172 Minn. 110, 215 N. W. 192; Morrill v. Little Falls Mfg. Co. 53 Minn. 371, 55 N. W. 547, 21 L. R. A. 174. But under the law of Delaware acquiescence and participation will bar the right of an assenting stockholder to complain. Finch v. Warrior Cement Corp.

(Del. Ch.) 141 A. 54; Peters v. U. S. Mtg. Co. 13 Del. Ch. 11, 114 A. 598. The plaintiffs, stockholders, had full knowledge of the then affairs of the corporation and the issuance and acquisition of all this stock. They had a direct and continuing benefit therefrom. They were the only stockholders who took any interest in the affairs of the corporation. We need not discuss the claim of defendant that the issue of this stock by an insolvent corporation to keep it going falls within a special class within Clark v. Bever, 139 U. S. 96, 11 S. Ct. 468, 35 L. ed. 88; Fogg v. Blair, 139 U. S. 118, 11 S. Ct. 476, 35 L. ed. 104; Handley v. Stutz, 139 U. S. 417, 11 S. Ct. 530, 35 L. ed. 227; Camden v. Stuart, 144 U. S. 104, 12 S. Ct. 585, 36 L. ed. 363. Nor need we discuss the controversial question that this stock was in fact treasury stock. We are of the opinion that plaintiffs are barred from questioning the voting privilege of the stock here involved. Bryant Inv. Co. v. Dimmick, 174 Minn. 339, 219 N. W. 185.

It may also be said that since the Eagle Transportation Company received the $6,000 from R. L. Glynn for the 240 shares of its stock which it issued and delivered to him, and then used the money in its own business and has never made any effort to refund the money, it is estopped from claiming that the stock was illegally issued. Plaintiffs' argument is that estoppel can be invoked only by the innocent; that the officers of the corporation had a fiduciary relation with the corporation and hence they could not use the property of the corporation for their own benefit. This contention, as an abstract rule of law, is probably correct; but the difficulty with its application is that the court has found that the facts are not as contended by plaintiffs. The established facts exonerate the officers of fraud and misconduct and make this transaction a bona fide one. Indeed, the findings show that the corporation received the $6,000 for 240 shares of stock which at that time were without value.

■ The attack upon the validity of the $12,200 chattel mortgage given to defendant R. L. Glynn cannot be sustained. Plaintiffs do not question the validity of the indebtedness secured by this mortgage. They attack the security only. The charge is that the directors' meeting at which this was authorized was not properly called and also that it was obtained by fraudulent representations. Glynn

furnished the corporation with $10,000. Two of the plaintiffs and another lent it $2,200. Glynn took this mortgage, not only to secure his $10,000 but also this other $2,200; and to the extent of the latter he held the mortgage as a trustee for the $2,200 creditors. There is a brutal charge against the minute books which purport to show an authorization for the execution of this mortgage. The trial court found that it was made in good faith and that Glynn parted with his $10,000 upon the faith of this security. The corporation of course received and used the money. It follows that the Eagle Transportation Company is estopped from questioning the validity of this mortgage; and again its stockholders are equally estopped.

■ The minute book shows, and the court found, that on July 27, 1925, the board of directors by resolution authorized Victor L. Power, as its agent, to sell three buses and operating rights between Hibbing and Duluth to the Northland Transportation Company of Delaware. Four days later Power executed such a contract, wherein the consideration was given as $75,000. The contract contained a provision however that the vendor should, on or before February 1, 1926, obtain a certificate of convenience and necessity from the railroad and warehouse commission, pursuant to the laws of the state, to operate between said points; and it was further therein provided that the contract should depend upon the commission's approving the assignment of such certificate from the vendor to the vendee. The contract also provided that the vendor should obtain such certificate authorizing the operation of not less than four round trips per day over said route, the validity of the contract depending upon the performance of such conditions. The contract contained a further provision that it would be binding if the applicant procured such a certificate to operate 40 per cent of the total of all trips by all operating companies between said points. Pending the consummation of such conditions the vendee rented two buses to the Eagle Transportation Company at a monthly rental of $400 for each bus from the date of the contract until the termination of performance thereof.

On October 27, 1925, the last mentioned contract was modified by a further agreement, to the effect that if any of the parties became involved in litigation relative to the granting of a certificate by the commission then during the pendency thereof the Eagle company was to operate its bus line for and in behalf of the Northland company, the latter to pay all the expenses of operation and receive all the proceeds. This contract was made because the Eagle company had no funds with which to carry on its bus operations, and Victor L. Power, P. M. Glynn, and R. L. Glynn had refused to lend any further money to the company. In this connection the officers of the Eagle company advised the Northland company that unless the latter would finance the operation of the Eagle company it would abandon its operations. Thereafter the Northland company continuously financed the operation of the Eagle company and directed the management thereof to November 23, 1925, when the operation thereof was taken over by the Northland company for and in behalf of the Eagle company. Such operation was subsequently authorized by an order of the commission dated December 28, 1925, and from said date until September 23, 1926, the Northland company operated the business between Hibbing and Duluth for the Eagle company, furnished the equipment therefor, and financed the operations.

On November 14, 1925, the commission granted a certificate of convenience and necessity to the Eagle company for the run between Hibbing and Duluth, but it did not determine the number of scheduled runs which the Eagle company could operate and left that question open until the making of a further order.

The Mesaba Transportation Company, a competitor, appealed from the order granting such certificate of convenience to the Eagle company, and the appeal was tried in the district court of St. Louis county. Thereafter the appeal was dismissed and judgment entered on the order on May 15, 1926. On May 8, 1926, the commission made an order limiting the number of runs which the Eagle company could operate between Hibbing and Duluth to four round trip schedules, and thereupon the Eagle company contended that it was

in a position to carry out the contract of sale to the Northland company. This was disputed. The Northland company contended that the number of runs of the Eagle company as specified in the order of the commission was so conditioned as to hours that they were worthless for operating purposes and that the Eagle company was not in a position to carry out the terms of the contract of sale. Thereupon and thereafter and continuously to September 9, 1926, the Northland company, by and through its representatives, endeavored to obtain from the commission and by agreement with the Mesaba Transportation Company a number of runs upon said route unconditioned which would permit the Eagle company to comply with its contract.

The litigation with the Mesaba company having been terminated, as stated, and the Northland company thereafter not being obligated to carry on the operations of the Eagle company and assume the loss thereof, it notified the Eagle company that its operation of the business would be carried on by the Northland company at the sole cost and expense of the Eagle company. The Eagle company acquiesced. The Northland company continued to operate the Eagle company for and on behalf of the Eagle company until September 23, 1926, and during said period of operation it incurred a loss chargeable to the Eagle company of about $15,000. The operation loss of the Northland company from the time that the said operation was taken over by it for the Eagle company to September 23, 1926, was the sum of $49,052.95. This was its own loss.

On January 12, 1926, at a meeting of the stockholders of the Eagle company, the action of the board of directors and the officers of the Eagle company and Victor L. Power in entering into the supplemental contract of October 27, 1925, and the turning over of the operation of the Eagle company to the Northland company pursuant to an order of the commission was approved.

Between June, 1926, and September 23, 1926, Victor L. Power having died in April, 1926, R. L. Glynn and P. M. Glynn repeatedly demanded of the Northland company performance of their contract, but the latter refused to perform. The Eagle company and the

Glynns consulted attorneys, who expressed grave doubts that the Eagle company, under the order of the commission, could comply with the conditions of its contract with the Northland company; and they were advised to settle with the Northland company under the best possible terms. At that time defendant claimed the Eagle company owed it a large sum of money, as hereinbefore stated, and that the Eagle company was unable to perform its contract of sale. At a meeting of the board of directors of the Eagle company on April 26, 1926, a resolution was passed authorizing and directing that the sale be made and the property be transferred upon performance by the Northland Transportation Company, presumably of Delaware.

In September, 1926, as a compromise of the controversy existing between these companies, the Northland company offered to pay to the Eagle company $44,000 and cancel all claims in addition to said sum which the Northland company might have against the Eagle company because of the facts hereinbefore stated. This offer of $44,000 in cash was to be for the property covered in the original contract of purchase of July 31, 1925. This proposition was submitted at an irregularly called meeting of the stockholders and the board of directors of the Eagle company on September 9, 1926. Two of the plaintiffs were directors in attendance at this meeting. All of the directors present voted for a resolution directing and authorizing Hugh McEwan, president of the company, and P. M. Glynn, secretary, to compromise the dispute existing between the two companies and to complete a sale of the property on such terms and conditions as the said president and the secretary deemed proper. Immediately thereafter these two officials accepted the offer of the Northland company.

Pursuant to such action of the Eagle company on September 9, 1926, the officers of the Eagle company on September 11, 1926, did transfer and deliver to the Northland Transportation Company of Minnesota an assignment of the properties described in said July 31, 1925, contract and secured an order of the commission authorizing the Eagle company to assign to the Northland company the cer-

tificate of convenience and necessity of the Eagle company to operate between Hibbing and Duluth; and thereupon the said transferee paid to the Eagle company the sum of $44,000 and canceled all indebtedness of the Eagle company to both of the Northland companies.

On September 21, 1926, at a regularly called meeting of the stockholders of said company, they by resolution ratified and approved the action of the stockholders and the directors of the company at the irregularly called meeting held on September 9, 1926, hereinbefore mentioned, and authorized and empowered the officers of the Eagle company to compromise and adjust the disputes existing between the Eagle company and the Northland company hereinbefore mentioned, and the officers were authorized to execute and deliver the necessary bill of sale to transfer the property sold by the contract of July 31, 1925, for the sum of $44,000.

On November 1, 1926, a regular meeting of the stockholders of the Eagle company was held, and a resolution was adopted approving the acts of the president and the secretary of the Eagle company in so completing the sale of the Eagle company's properties to the Northland Transportation Company of Minnesota, and they fully ratified said sale and further ratified the disposition of the said $44,000, which was used in this manner: There was paid to R. L. Glynn $13,756.17 in payment of the principal and interest on the note and chattel mortgage for $12,200, and he satisfied said mortgage and distributed $2,200 thereof with interest to the three persons for whom he was holding the security in trust, as hereinbefore stated; there was paid the sum of $1,730.61 to R. L. Glynn as accrued interest upon the principal sum of the second mortgage of $36,042.31; and there was paid to said Glynn to apply upon the principal of said second mortgage the sum of $28,513.22, and Glynn satisfied said second mortgage to the extent of the properties and franchises so transferred. All this money was devoted to the payment of secured obligations of the Eagle company, except that $4,000 thereof was paid to a broker aiding in the consummation of the transaction, $1,050 was paid for attorney's fees, and $1,500 was paid

to P. M. Glynn on account of moneys owing by the company to her. The full $44,000 accrued to the benefit of the stockholders. There remains unpaid to said R. L. Glynn on account of said second mortgage the sum of $7,529.09 with interest; and in addition thereto he has advanced other money for which he has no security.

Here we have the deliberate act of the stockholders authorizing, approving, and ratifying the transaction now under an attack by plaintiff stockholders. But the transaction is free from fraud, and under the findings of fact plaintiffs are without any legal foundation or support in their claim for relief. The sale was valid and complete. There being no fraud, the transaction was closed forever. The Eagle company had full knowledge of the entire transaction. It received the fruits of the transaction. The money was used to pay honest debts, mostly secured debts. It makes no suggestion of returning what it received. It would be unfair for it to now be heard to complain.

The Northland Transportation Company of Delaware is a holding corporation owning all the common capital stock of the Northland Transportation Company of Minnesota, which is an operating company having a license and permit from the commission to operate passenger buses upon different highways in the state. The officers of both corporations are identical. The holding company has never had any license or permit from the commission to operate buses in the state of Minnesota, and it never intended to carry on any bus operations in this state, the contract made by it with the Eagle company being made for and in behalf of the Northland Transportation Company of Minnesota; and the trial court found that the two Northland companies were for all purposes material to this action one and the same company, and in the findings it made no distinction between these two companies. Later the Minnesota Northland acquired and succeeded to the business of the Mesaba Motor Company; and, as otherwise herein stated, is extensively engaged in the operation of bus transportation service throughout this state.

Of course the Northland Transportation Company of Delaware and the Northland Transportation Company of Minnesota are

separate legal entities. That could not be otherwise. They are organized under different states. The fact that the contract is with the one and transferred to the other is not necessarily a fraud. We do not see that the transaction was a fraud at all. Plaintiffs were in no way prejudiced. The situation might have been different had this transfer been made, as claimed by the plaintiffs, in collusion and fraud and for the purpose of evading responsibility under the original contract; but the findings of fact do not so hold. The record does not permit us to disturb the findings of fact, which are to the contrary.

Plaintiffs' assertions rest upon the claim that this was a subterfuge, by which the one corporation with the assistance of the other was relieved from performing a contract which it did not desire to perform. Upon this hypothesis plaintiffs say that a wrongdoer is now invoking an equitable exception to the general rule of separate legal entities; but the facts as found refute this claim. Here we have no wrongdoer.

■ Along this same line of thought the plaintiffs label the possession of the property acquired by the Northland Transportation Company of Minnesota wrongful, and say that it was a conversion for the purpose of making it impossible for the Eagle company to perform its contract with the Northland Transportation Company of Delaware. This assertion is also unjustified under the findings of fact established by the trial court. The Northland Transportation Company of Delaware never refused to carry out the contract of purchase on the ground that the Eagle company was unable to deliver the property to be conveyed. The grounds which were the basis for the refusal to perform the contract of purchase were asserted just as much by the Northland Transportation Company of Minnesota as by the Northland Transportation Company of Delaware. It is suggested that the Northland Transportation Company of Delaware was also a conspirator in an organized effort to evade performance of the contract of purchase. It would seem that so far as plaintiffs are concerned the representatives of either of these corporations were at all times acting for both corporations,

and before we should hold the Northland Transportation Company of Minnesota liable herein we should be in a position to say that the Northland Transportation Company of Delaware would be liable had it done precisely the same things as were done by the Northland Transportation Company of Minnesota. The record however fails to establish fraud, collusion, or conspiracy, and in view of what we hereinafter say relative to the doctrine of estoppel we need not now further discuss this feature of the case.

■ Another element of wrongdoing is directed at R. L. Glynn and Victor L. Power and their management of the affairs of the Eagle company so as to consummate the sale and transfer. These persons had a large financial interest and were quite naturally anxious to get their money. The accusation goes so far as to say also that Glynn and defendant used their influence to have the commission decline to give such a certificate as would permit the performance of the contract of sale. One of the strong circumstances that refutes this claim is that defendants' counsel on May 7, 1926, wrote a letter to the railroad and warehouse commission vigorously protesting and complaining of an order of the commission fixing the schedules between Hibbing and Duluth. This communication, apparently with much reason, complained bitterly at the schedule provided and pointed out that if the said schedule was to stand it would be ruinous to defendant's operation of the property, which they were acquiring from the Eagle Transportation Company, between Hibbing and Duluth. It is obvious that the defendant was then desirous of acquiring the property of the Eagle company in order to gain an entry into the Iron Range from the city of Duluth, to which its lines then extended. It is quite clear that the defendant, because of its connecting lines, considered it to its advantage to acquire the property of the Eagle company and use its franchise between Hibbing and Duluth, though the stock in the Eagle company then held by plaintiffs and others had no value.

■ It is suggested that the Eagle company was in a position to carry out its contract of sale when the order of the commission was made on May 8, 1926. This is a very doubtful suggestion. It

was a disputed matter. The position taken by the defendant cannot be considered unreasonable in the face of written opinions of reputable lawyers who were advising the Eagle company and Mr. Glynn separately that it was doubtful if the Eagle company was in a position to comply with its contract. It is clear that there was an honest, debatable controversy. When the negotiations were concluded the Eagle company was indebted to the defendant for about $15,000, which the defendant had lost in the temporary operation of the business of the Eagle company. Instead of the Eagle company's receiving $75,000 or $60,000, as contemplated by the contract of sale, it received $44,000 and a cancelation of all indebtedness which it owed the defendant. The Eagle company did not receive very much less than if the contract had been carried out. Incident to the delay defendant had lost $49,052.95, which was probably urged as a reason for a reduced price. The price paid for the assets which defendant Northland Transportation Company so brought "was a fair price, under all the circumstances then and there existing." As we understand the record, no certificate was ever obtained from the commission as contemplated in the contract of sale that required the payment of $75,000. So far as the order did give four round-trip runs, they were apparently for experimental purposes and were not granted without any conditions. This left negotiations open for the best bargain either party could negotiate.

■ The statute of Delaware authorizes the sale of all the property and assets of a corporation by its board of directors when and as authorized by the stockholders. The claim is here advanced that such statute makes it impossible for the stockholders to authorize a sale through and by its officers (the president and the secretary) as here done. We think the statute fixed the sole manner in which the directors could sell such assets and good will; but that does not mean that the stockholders who own the corporation may not decide to sell through some other channel. The stockholders decided for themselves to accept the offer. They authorized their president and their secretary to close the sale which they did. It may also be noted that since the contract was within the power of the corporation the stockholders had power of ratification.

Parker College v. Minnesota Annual Conference, 182 Minn. 501, 235 N. W. 12.

■ It is further asserted that Hugh McEwan was not a stockholder and was not qualified to be and was not president, and that P. M. Glynn was not in fact secretary and treasurer. But both of these persons assumed to act extensively in their respective, assumed official capacities and with much apparent justification. There is nothing to indicate that either McEwan or Mrs. Glynn were usurpers; nor were they promoting their own individual interests. Neither of these persons is a party to this action. They did in fact act as officers, and until this action was commenced no one questioned their right to do so. A person openly acting as an officer of a corporation is presumed to be rightfully in office so far as third persons are concerned, 14a C. J. p. 78, § 1839; and the corporation or the stockholders may by acquiescence or ratification be estopped as to third persons from questioning their eligibility or the regularity of their election, id. Whether McEwan and P. M. Glynn were de facto officers we need not consider. It would seem an injustice to permit the Eagle company to receive $44,000 through its purported authorized activities and keep the money or use it as here to pay its debts, and then say to defendant, which gave it such money, that the transaction is void because the persons who acted for it, received and applied the money upon its debts, were never elected to their respective offices and were authorized so to act at an irregularly called meeting of the stockholders, and hence that it will not be bound thereby and defendant Northland Transportation Company must lose its money that it so credulously paid to such officers. The circumstances estop plaintiffs from taking such position.

■ There is another reason why plaintiffs need not worry about the Eagle company's being rendered unable to perform its contract with the Northland Transportation Company of Delaware. For all practical purposes these two Northland corporations were the same as the trial court held. The officers were identical. The officers of the Delaware Northland were charged with the knowledge of the

Minnesota Northland. They were all in accord. If the Northland Transportation Company of Minnesota was guilty of the conduct charged by plaintiffs, it would have been liable to the Northland Transportation Company of Delaware. Sorenson v. Chevrolet Motor Co. 171 Minn. 260, 214 N. W. 754. But the Delaware Northland was obviously a party to and acquiesced in what the Northland Minnesota did. As to these two corporations and the Eagle company, the Eagle company was the creditor which was to receive the money for its property. Instead of getting what its contract with the Northland Transportation Company of Delaware called for, it accepted in satisfaction of its claim for the purchase price of such property $44,000, and a cancelation of an adverse claim for $15,000. For this consideration from the hands of the Northland Transportation Company of Minnesota, a third person, a stranger to the contract upon plaintiffs' theory, the Eagle company accepted what it received in discharge of its obligation to transfer its property. The Northland Transportation Company of Delaware acquiesced and by implication authorized and later ratified the transaction. This constitutes an accord and satisfaction. 1 C. J. p. 535, § 27; Clark v. Abbott, 53 Minn. 88, 55 N. W. 542, 39 A. S. R. 577; Schmidt v. Ludwig, 26 Minn. 85, 1 N. W. 803; Anno. 41 A. L. R. 1490. This discharged the Eagle company from liability on its contract to transfer the same property to the Northland Transportation Company of Delaware. Such is the legal result of conduct. The transaction is a complete defense for the Eagle company as to any subsequent demand by the Northland Transportation Company of Delaware arising out of its contract.

■ If we could adopt plaintiffs' claim that the corporation made an unauthorized contract due to the invalidity of the certain shares of stock, disqualification of certain persons for want of stock or other things to act as officials, and that the Eagle company accepted the benefits arising from such contracts with knowledge of the facts and rights, it and the plaintiffs are estopped to deny the validity of any such contract. Bryant Inv. Co. v. Dimmick, 174 Minn. 339, 219 N. W. 185; 2 Thompson, Corp. (2 ed.) § 1960; St. Joseph's P. C.

B. Soc. v. St. Hedwig's Church, 4 Pennewill (Del.) 141, 53 A. 353. Stockholders cannot sit idly by, acquiesce in dealings with others, and later, when dissatisfied with the results and the fruits of the bargain are consumed, seek to avoid the consequences. Finch v. Warrior Cement Corp. (Del. Ch.) 141 A. 54; Bowen v. Imperial Theatres, Inc. 13 Del. Ch. 120, 115 A. 918; John W. Cooney Co. v. Arlington Hotel Co. 11 Del. Ch. 286, 101 A. 879; 5 Fletcher, Corp. § 3586, p. 5913; 3 Fletcher, Corp. p. 2791, § 1661. The doctrine of estoppel is grounded in the thought that if one is silent when he ought to speak equity will debar him from speaking when conscience requires him to be silent. The benefits of this transaction now under attack were accepted and applied to the use of the corporation. This was beneficial to all stockholders. The money was paid to the Eagle company in good faith. Conscience should not permit plaintiffs to subject defendant Northland Transportation Company of Minnesota to a loss because thereof. We have not discussed in detail all of plaintiffs' claims, which are barred by the doctrine of estoppel; but we have endeavored to point out sufficient to show that the plaintiffs cannot prevail in this action.

Affirmed.