## McCombs Producing and Refining Company, et al. v. Ogle, et al.

(Decided June 15, 1923.)

### Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

1. Evidence—Common Law Not Presumed to Prevail in Foreign State, Whose Statutes Were Pleaded Without Denial.—The court will not presume that the common law prevails in a foreign state, where provisions of the Constitution and statutes of the foreign state governing the controversy are pleaded by plaintiffs, and not denied.

2. Corporations—Actual Fraud in Issuing Stock for Property May be Inferred from Circumstances.—Under a statute of a foreign state under which a corporation was organized, and which provided that in the absence of actual fraud the judgment of the directors as to the value of the property taken in exchange for stock shall be conclusive, the actual fraud or intentional wrongdoing may be inferred from circumstances, and inadequacy of consideration may be considered in connection with other facts from which such fraud may be inferred.

3. Corporations—Evidence Held to Show Cash Payment for Property Transferred to Corporation in Exchange for Stock Represented its Full Value.—In a suit to cancel stock issued by a corporation, evidence that all of the stock was issued for property transferred to the corporation, and that the former owner of the property received a cash sum from the proceeds of the sale of stock, re-

turned some of the stock to the treasurer to be sold to raise the payment, and had other stock issued in the name of other individuals, who had as yet rendered no services to the corporation, and who were to be compensated for their future services in selling the stock. held to show that the cash payment represented the full value of the property, so that the stock issued to the other parties was without consideration.

4. Corporations—Donation of Stock by Those to Whom it is Issued is Evidence it Did Not Represent Assets.—Though an individual who received all the stock of a corporation in exchange for property may donate it to others, without consideration and without invalidating the issuance of the stock, the fact that they did distribute it among seven or eight different persons for the labor those persons were to render to the corporation in the future, for which they were also to receive compensation, is evidence that the recipients of the stock did not regard it as representing any real assets.

5. Corporations—Stock Issued to Individuals for Services to be Rendered Newly Formed Corporation Held Bonus Stock, Issued Without Value.—Where stock in a corporation was issued to several individuals, who gave no consideration to the corporation therefor, and who had as yet rendered no substantial services, since the corporation had just been formed, and were to receive a 40 per cent commission on future sales of the stock, the stock was bonus stock, issued without value, which may be canceled.

6. Judgment—General Prayer in Petition for Cancellation of Stock Held to Authorize Judgment for Value of That Not Surrendered.—Where a petition for the cancellation of stock issued to individual defendants contained a prayer for general relief, it authorized a judgment against one of the stockholders for the value of the stock which he was ordered to surrender for cancellation, but which he was unable to surrender because he had transferred it to a brokerage firm.

7. Corporations—Stockholder, Who Failed to Surrender Stock Issued Without Consideration, is Liable for its Value at Time of Conversion.—Where a stockholder was unable to surrender stock wrongfully issued to him for cancellation as required, because he had placed the stock beyond his control, the measure of his liability is the value of the stock at the time it was converted, and not its value at the time of the judgment, so that he was properly denied the right to purchase other stock to surrender in place of it.

HUMPHREY, CRAWFORD & MIDDLETON for appellants.

FRED FORCHT and BEN F. WASHER for appellees.

OPINION OF THE COURT BY JUDGE MOORMAN—Affirming.

This action was instituted in the Jefferson circuit court by appellees, stockholders of the McCombs Producing and Refining Company, to cancel a number of

shares of stock of the corporation that had been issued to other stockholders, the appellants here, about the time the company was organized, or shortly thereafter. The ground for the relief sought was that the stock had been issued to appellants without consideration therefor, and in moral, legal and actual fraud against the corporation and all the parties who might thereafter become *bona fide* stockholders of the corporation, including the appellees. These averments of the petition were denied, and on final hearing the chancellor granted the relief sought and canceled the stock. It is from that judgment that this appeal has been prosecuted.

The facts relating to the organization and development of the McCombs Producing and Refining Company are: That J. C. McCombs owned, in the summer of 1917, a tract of about 24 acres of land in Estill county, on which five oil wells had been drilled, with a resulting production of "approximately 300 barrels per day." He also owned oil and gas leases on about 12,000 acres of land in Knott county. On August 7, 1917, he entered into a contract with Dr. H. A. Moore, of New York, by which they agreed to organize a corporation under the laws of the state of Delaware, with an authorized capital stock of 5,000,000 shares, of the par value of $1.00 per share or no par value, to which McCombs agreed to sell and transfer the 24-acre tract in Estill county and to assign the oil and gas leases in Knott county. It was agreed that the corporation should pay $312,000.00 for this property not later than February 15, 1918, "and in addition thereto 5,000,000 shares of the stock, less 50 shares to the incorporators of said corporation as fully paid and non-assessable." It was further agreed that the 5,000,000 shares of stock, less 50 shares to the incorporators, should be issued to McCombs, and he would immediately transfer and assign to the corporation 1,000,000 shares, less 50 shares to the incorporators, and transfer and assign 4,000,000 shares in blank and deliver them to the Winchester Bank at Winchester, Kentucky; that the corporation would enter into a contract with H. A. Moore for the sale of the 1,000,000 shares assigned to it upon the terms that none of the stock would be sold at a price less than 55c a share, and Moore should receive as his compensation for selling it 40% of the sale price, but that McCombs, until and including February 15, 1918, should have the right to fix the maximum price at which it should be sold, and that the net proceeds realized from the sales should be used,

so far as necessary, in paying to McCombs the $312,-000.00; that Moore should have the exclusive agency for the sale of 500,000 shares of the stock held by the Winchester Bank, and should account for it to McCombs at 60c a share; and that as soon as Moore had sold enough of the 1,000,000 shares to realize, with all sums received from the sale of oil, the $312,000.00, and had sold the 500,-000 shares just referred to and accounted to McCombs therefor at the rate of 60c a share, then he should be entitled to have delivered to him, as fully paid and non-assessable, 3,000,000 shares of the stock held by the Winchester Bank, and McCombs would be entitled to have delivered back to him the remaining 500,000 shares deposited with that bank. A further provision of the contract was McCombs should receive the net proceeds from the oil produced on the 24 acres, during the course of the fulfillment of the contract, to be credited on the purchase price of the properties.

On September 7, 1917, a corporation—McCombs Oil Company, the name being changed later to the McCombs Producing and Refining Company—was organized under the laws of the state of Delaware, with an authorized capitalization of 5,000,000 shares of the par value of $1.00 each. The entire capital stock was subscribed to by the organizers of the corporation, all of whom were residents of Dover, Delaware, and at the meeting of the incorporators on that day transfers of subscriptions were presented and approved in the following names: To J. C. McCombs 4,999,950 shares, to Abram Renick 10 shares, to William O. Head 10 shares, to Harvey A. Mohney 10 shares, to Frank W. Davis 10 shares, and to George W. Clynes 10 shares. The first five named gentlemen were elected directors of the company. At the first meeting of the board of directors held in Louisville on September 14, 1917, Abram Renick was elected president, William O. Head, Harvey A. Mohney and George W. Clynes were elected vice presidents, John C. McCombs was elected treasurer, and Frank W. Davis made secretary. At that meeting a draft of the agreement of August 7 between McCombs and Moore was approved, and by resolution duly passed the company purchased the properties of McCombs at the price mentioned in the agreement and adjudged the price to be the fair and reasonable value of the properties. At the same meeting a motion was made to appoint Paul M. Wade the sole and exclusive agent to sell the treasury stock of the company, consisting of

1,000,000 shares, and to declare a dividend of 1% on the outstanding stock for the month of October, 1917. The motion was not passed on, and the meeting was adjourned subject to the call of the chairman without notice. The meeting was resumed in Lexington on September 18, and Paul M. Wade was made the sole and exclusive agent to sell the first million shares of treasury stock at 75c a share, and any additional stock thereafter issued at a price the minimum of which was to be fixed by the board of directors, for which he was to receive 40% of the sale price as his remuneration. The agreement of August 7 was further changed in that 1,999,950 shares of the stock were assigned and transferred to the company and 750,000 shares were issued to J. C. McCombs, 825,000 to H. A. Moore, 325,000 to Abram Renick, 300,000 to William O. Head, 300,000 to Paul M. Wade, 300,000 to J. McLaughlin, and 200,000 to Rosario Maggio, all of which, except that reserved to the company, were to be placed in escrow with the United States Trust Company of Louisville until the expiration of six months after J. C. McCombs had been paid the stipulated amount of $312,000.00 to be realized from the sale of the treasury stock and the oil obtained from the company's properties. At a meeting of the stockholders held at the same place, and immediately following the meeting of the directors, the treasury stock was increased to 2,500,000 shares, the other parties to whom stock had been issued reducing their holdings ratably to make up the increase in treasury stock.

It will be noted that under the original contract with Moore, which was entered into with the view of organizing the corporation, McCombs was to be paid $312,000.00 and receive 5,000,000 shares of the capital stock, 1,000,000 of which were to be sold to pay the $312,000.00, another 500,000 shares were to be sold to net McCombs 60c a share, and when this stock had been sold he was to receive 500,-000 additional shares and Moore was to receive the rest, amounting to 3,000,000 shares; that Moore was to be paid 40% of the selling price of not less than 55c a share for the first 1,000,000 shares, and as to the next 500,000 shares he was merely to account for them to McCombs at 60c a share; that at the first directors' meeting it was provided that 1,999,950 shares should be treasury stock, and that Paul M. Wade should have the exclusive right to sell that stock on a commission of 40% of the sale price, and the rest of the stock was apportioned among various persons, seemingly without reason or any consideration therefor; and that at the stockholders' meeting immedi-

ately following the directors' meeting enough was added to the treasury stock to make it 2,500,000 shares, and those to whom stock had been given at the directors' meeting surrendered a sufficient number of their shares to make up this increase in the treasury stock.

At the time this stock was issued to the directors, as indicated, none of them had done anything to aid or perfect any of the legitimate enterprises of the corporation, but immediately thereafter Wade and McLaughlin began to sell stock on a commission basis, and Renick opened an office in Louisville and likewise engaged in the sale of the stock. Two additional wells had been drilled on the property in the late summer of 1917, and two other wells were shortly thereafter driven. A dividend was declared and paid to the shareholders, except the holders of the stock in escrow. Stock was sold at various prices, ranging from 75c to $2.50 a share, and some of appellees purchased their holdings at the latter figure, one of whom invested approximately $100,000.00 in the stock of this company. Some months later the earnings of the company began to decline with the decrease in production and depreciation in the price of oil, and at the time this litigation was instituted the value of the stock was far below the lowest price at which it had been sold to appellees. It appears that the stock held by the United States Trust Company was never delivered to appellants, but several months after it was issued they agreed among themselves to reduce it to 543,752 shares, and they issued to themselves certificates for that number of shares without any authority from the company. These certificates, as well as the stock held in escrow, were canceled by the court below, except 15,000 shares of the duplicate stock issued in the name of Abram Renick. He was unable to produce that stock, and in lieu of canceling it the chancellor rendered judgment against him for $15,000.00, from which there also is an appeal.

The law of the state of Delaware, under which the McCombs Producing and Refining Company was organized, provides that subscriptions to or purchases of the capital stock of any corporation organized under the laws of that state "may be paid for, wholly or partly, by cash, by labor done, by personal property or by real property or leases thereof," and, "in the absence of actual fraud in the transaction, the judgment of the directors, as to the value of such labor, property, real estate or leases shall be conclusive." Appellees pleaded this provision of

the law, as well as the constitutional provision of that state governing the issuing of the stock of corporations, which is similar to the provision in Kentucky on that subject.

It is contended, on the authority of U. S. Cast Iron Pipe & Foundry Co. v. Henry Vogt Machine Co., 182 Ky. 473, and cases there cited, that as no decision of the Delaware courts construing the statute is pleaded this case must be governed by the common law of that state, which, in the absence of pleading and proof, is presumed to be the same as the common law of Kentucky, under which a transaction involving the issue of stock for property could be assailed only on the ground of fraud, and hence, passing the question as to the value of the property turned over to the company by McCombs in the summer of 1917, it was incumbent upon appellees to show actual fraud in the issuing of the stock, and no implication thereof arises from an overvaluation of the property exchanged for it. The U. S. Cast Iron Pipe & Foundry Co. case is not authority for this position, for in that case there was neither pleading nor proof in the record as to what the law of the state of Delaware was, nor were the articles of incorporation made a part of the record, whereas in the case at bar the constitutional and statutory provisions of Delaware are pleaded and not denied, and it appears that the constitutional provision is substantially the same as that of Kentucky, and also that the statutory provision of that state is similar to the one in Kentucky, the difference being that the statute of Delaware requires allegation and evidence of actual fraud. This is not, therefore, a case that is controlled by the common law, but one to which the statute of Delaware applies. That statute, as pleaded and undenied, provides that in the absence of actual fraud in the transaction the judgment of the directors as to the value of the property shall be conclusive. That actual fraud or intentional wrongdoing may be and often is proved by or inferred from circumstances is an established principle, and that inadequacy of consideration may be considered in connection with other facts from which fraud may be inferred is also well settled. Taylor v. Citizens Oil Co., 182 Ky. 350, does not militate against these principles, for all that was held in that case with respect to the leases was that the surrendering of them a few months after the dissolution of the old companies was not a circumstance of great probative weight in determining their value,

because the question was, were they of value at the time they were transferred to the old Citizens Company?

The question just indicated is adopted by appellants in this case as the foundation for the inquiry, "Was or not there any consideration for the stock sought to be canceled?" The trial court found that the $312,000.00 paid to McCombs represented more than the fair value of the property that he turned into the corporation. The evidence relating to that subject is voluminous, and, as indicated in the opinion of the chancellor, the values are variously estimated by the witnesses according to interest or point of view. Undoubtedly many of the witnesses for appellants fixed the value of the 24 acres and the leases in Knott county far above the money consideration, and some of them in excess of that sum and the 5,000,000 shares of stock at its par value. Other witnesses testified to facts from which the inference is irresistible that the obligation to pay $312,000.00, with the manner in which it was secured, represented more than the value of the property turned over to the company. The stipulation as to the output of the wells on the 24-acre tract, or rather as to the quantity of oil which the Cumberland Pipe Line Company took from the wells from April 11, 1917, to May 31, 1920, after resolving every doubt in favor of appellants as to the amount of oil that the pipe line company could and did take, indicates a possible maximum production far below that estimated in the contract of August 7, 1917. Aside from that fact, one may look to the conduct of McCombs and Moore, at the time the company was organized and immediately thereafter, as signifying their conception of the value of the property, and in fact as convincing evidence of its actual value at the time the stock was issued. Considering the question from that standpoint, we find that, notwithstanding Moore was to receive 40% of the proceeds of the sale at 55c a share of 1,000,000 shares of the stock, and, after having sold that stock and 500,000 more shares, was to receive 3,000,000 shares of the stock or a controlling interest in the company, at the first stockholders' meeting he surrendered his right to sell the 1,000,000 shares on a handsome commission basis, and also the right to acquire the 3,000,000 shares, in consideration of 687,490 shares issued in his name and placed in escrow until the 1,000,000 shares had been sold and McCombs had been paid the purchase price. McCombs also surrendered a considerable part of the stock that he would probably have received under the contract.

Furthermore, W. O. Head, who had performed no service whatever for the company, was made a director and was given 300,000 shares of the stock. He thought the company overcapitalized and was unwilling to lend his name to the promotion of its purposes, and in consequence he shortly withdrew and refused to act as a director or to accept the stock. Abram Renick and Paul M. Wade were given large blocks of stock, although they had performed no service for the company, and it does not appear that they ever performed any service for which they were not fully compensated independently of the stock that was donated to them. There is in fact no showing of any consideration for the stock issued to appellants, unless it be the right to use their names as promoters of the company and the services they were expected to render in selling stock. As to the latter, the liberal commissions allowed were sufficient compensation for the services rendered. When McCombs was asked why it was that the contract provided that he was to receive $5,000,000.00 of the stock of the corporation, when in fact he was only to receive $2,500,000.00, he replied: "The reason for that, I would think, is we had 2,500,000 shares placed in the treasury for sale and 2,500,000 shares of seven or eight different parties, possibly much more, for the labor they were to extend to the company." He was then asked: "So that the 2,500,000 shares which were to be distributed among these gentlemen you have named went to them in consideration of labor and service which they had already or would thereafter render? Is that true?" to which he replied, "Yes."

But it may be said that the lack of consideration for this stock is not a material question, since if it rightfully belonged to McCombs and Moore they had a right to donate it to others. And that is quite true. But the fact that they did distribute it among seven or eight different persons "for the labor they were to extend to the company" shows, when viewed in the light of the fact that none of those persons performed any service to pay for the stock, that McCombs and Moore did not regard it as valuable or as representing any real asset, and that the property that the company acquired was fully covered by the consideration of $312,000.00. McCombs' method of safeguarding the payment of the $312,000.00, his improvidence in dealing with the stock, his entering into a contract with Moore without knowing what character of man Moore was, his association with the other pro-

moters without investigating their records and their reputations, and his care in safeguarding the money consideration in his transactions—in fact his own testimony when carefully examined, all lead to the inevitable conclusion that he did not regard the properties that the company acquired as having any value in excess of the $312,000.00. These circumstances, with the other evidence, in our opinion sustain the view of the chancellor that the properties were not worth more than $312,000.00, and accordingly there was no consideration passing to the company for the stock that was issued to appellants.

In Cooney Co. v. Arlington Hotel Co., 101 Atlantic 879, which was an action to collect from the stockholders of a company the money not paid on their shares of stock in order that the receiver might pay the debts of the company, in speaking of the issue of bonus stock the Court of Chancery of Delaware said: "Whether it be moral, legal or actual fraud, or not fraudulent at all, the obvious purpose in issuing all the common stock to Howard, Andrews and Archibald, as set forth in the resolution of the directors at their first meeting on February 27, 1911, was to give them the stock without their having given the legal equivalent therefor. The most that could be claimed for it was that it was issued for services rendered and to be rendered, without stating what part of the $2,900,000.00 of common stock was issued for past services rendered and what for future services to be rendered." After referring to the fact that the stock was issued in the earliest stages of the corporate existence, the court said: "With such scanty opportunity for having done work for the corporation after its organization, and in the absence of any statement of the character or value of such services theretofore rendered, or evidence of any valuation thereof by the directors, the issuing of $2,900,000.00 worth of stock for services rendered and to be rendered was of itself palpably indicative of an intention to avoid the statute and Constitution, without reference to the other features of the resolution." It was held that the stock was bonus stock, issued without value, and the holders thereof were liable for the unpaid part of its value. The quotations from this opinion aptly describe the situation presented in this record, and it is our conclusion that the chancellor correctly held that the stock was issued neither in good faith nor for actual value.

It is contended by Renick that the judgment rendered against him for $15,000.00 to reimburse the company for

15,000 shares of the stock that were issued to him without any corporate action should be reversed because unauthorized under the petition, and also because he never received any profit but sustained a loss on the stock, and further, at the time of the judgment its actual value did not exceed 10c a share. This stock was wrongfully issued at a time when the stock of the company was selling at about $1.50 a share. The original judgment ordered Renick to surrender the stock that had been illegally issued to him. He did not supersede the judgment, but complied with it except as to 15,000 shares. As to that stock he filed an affidavit stating that it was represented by a certificate issued in his name, that he had never indorsed, transferred or pledged it, but that it had been lost, misplaced or destroyed and he would make diligent search for it, and, if he could find it, would immediately surrender it into court as required by the judgment. In another affidavit of later date he stated that the stock had been turned over to a brokerage firm under an arrangement that was unprofitable to him.

The objection to the judgment on the ground of the deficiency of the petition cannot be sustained. It is true that the suit was for a cancellation of the stock, but the petition contains a prayer for all other general, equitable or special relief. Renick failed to surrender the stock for cancellation. It is an outstanding liability against the company. His first excuse for failing to produce it being held insufficient, he offered another, contradictory of the first, that is likewise insufficient. Not having produced the certificate, the chancellor had the power, under the general prayer of the petition, to render a personal judgment against Renick for the value of the stock. But it is suggested in brief that the chancellor would not permit him to purchase a like amount of stock on the market and substitute it for the stock in question. We find nothing in the record indicating that he ever made such an offer. Besides, the stock was wrongfully issued and delivered to him, and, as he did not comply with the order of court, the measure of liability was the value of the stock at the time it was converted, and this was shown to be not less than $15,000.00.

The judgment is affirmed on both appeals.