DIAMOND STATE BREWERY, INC., a corporation of the State of Delaware,

*vs.*

CAMILLE DE LA RIGAUDIERE, GUY DE LA RIGAUDIERE, ISA-BELLE DE LA RIGAUDIERE TUNIS and SYLVESTER A. HOSINSKI.

*New Castle, Jan. 13, 1941.*

*E. Ennalls Berl,* of the firm of Southerland, Berl, Potter & Leahy, and *David F. Anderson,* for complainant.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *Henry M. Canby,* for defendants.

THE VICE-CHANCELLOR: Complainant's case is that certain shares of its capital stock now owned by respondents were illegally issued without sufficient consideration and should therefore be cancelled. Defendants deny illegality in the original issuance, and assert that in any event, as to most of the shares, they were *bona fide* purchasers

for value without notice of any infirmity, and that the stock should not be cancelled.

Complainant was incorporated under the laws of Delaware on April 7, 1933. Its name, New Jersey-Delaware Brewing Company, was later changed to Diamond State Brewery, Inc. On March 22, 1933, a short time prior to its organization, the Congress of the United States authorized the manufacture of beer with a limited alcoholic content. 48 *Stat.* 16. In Delaware, such manufacture was permitted by an act of the General Assembly, passed on May 3, 1933. 38 *Del. Laws*, c. 19. The time of complainant's incorporation, its name, its objects and purposes as stated in its certificate of incorporation, as well as the activities it actually carried on, all indicate that the motivating purpose of its organization was the production of beer.

The incorporators named in complainant's certificate of incorporation were employees of a company which undertakes the work of preparing corporate charters and forming Delaware corporations and which acts as statutory agent for them. Neither the incorporators nor original directors, elected by the former, appear to have had any substantial financial interest in the corporation. One Guy de la Rigaudiere was the principal if not the sole promoter of the corporation, as is apparent from a resolution of the directors adopted at their first meeting, "That due appreciation be given to Guy de la Rigaudiere for his services as organizer of the New Jersey-Delaware Brewing Company which have extended over a period of eight months. * * *."

Complainant's charter authorizes the issuance of 800,-000 shares of class A stock of the par value of one dollar, and 200,000 shares of class B stock of the par value of twenty-five cents per share, the latter class being the voting stock. At the meeting of the incorporators, April 7, 1933, there was presented a written offer of Guy de la Rigaudiere, dated the same day, to sell and assign all his "rights, title and interest in and to a secret formula for the compounding

of a beverage known as 'Chamonix' with all necessary equipment to manufacture the same and to accept in full payment therefore fifty thousand shares of your class A stock and one hundred and twenty-five thousand shares of your class B capital stock full paid and non-assessable." The incorporators adopted a resolution authorizing the board of directors "to acquire said formula and equipment and to issue said stock in payment therefor, provided same are in the opinion of the board of directors of the actual value above stated and necessary to the business of the company." The directors at their first meeting resolved that the company accept the offer in accordance with the resolution of the incorporators; and the board did "adjudge and declare that said formula and equipment are of the actual value of $81,250.00 and that same are necessary for the business of the company which is hereby authorized and directed to issue" the stock to de la Rigaudiere or his nominees "in full settlement for the above formula and equipment."

The value, $81,250, fixed by the directors, was equal to the par value of the shares authorized to be issued. All of such shares were issued as full paid to persons designated by Guy de la Rigaudiere; and 41,830 class A shares and 117,155 class B shares were registered in the names of Guy de la Rigaudiere and his wife, Camille de la Rigaudiere, one of the defendants. Most of these shares were so held at the death of Mr. de la Rigaudiere in February, 1934. From them are derived the shares which complainant would now have cancelled in the hands of the defendants.

Complainant says that the issuance of this stock was without consideration and in violation of the following provisions of the Constitution of the State of Delaware, and of the Delaware Corporation Law:

*Article IX, Section* 3 of the *Constitution* reads thus:

"No corporation shall issue stock, except for money paid, labor done or personal property, or real estate or leases thereof actually acquired by such corporation."

*Section* 14 of the *Delaware Corporation Law, Rev. Code,* 1935, § 2046, provides in part:

"Subscriptions to, or the purchase price of, the capital stock of any corporation organized or to be organized under any law of this State may be paid for, wholly or partly, by cash, by labor done, by personal property, or by real property or leases thereof; and the stock so issued shall be declared and taken to be full paid stock and not liable to any further call, nor shall the holder thereof be liable for any further payments under the provisions of this Chapter. And in the absence of actual fraud in the transaction, the judgment of the directors, as to the value of such labor, property, real estate or leases thereof, shall be conclusive."

Complainant adduced evidence concerning the formula and equipment for which the directors agreed to issue the shares. In 1932 or 1933, one Marcel Tournier, a naturalized citizen of French birth, who resided in Vineland, New Jersey, sold to Mr. de la Rigaudiere a formula for Chamonix, and equipment, consisting of a saturator and a carbonator for manufacturing it. For these, de la Rigaudiere agreed that Tournier should receive, after the organization of the present complainant corporation, one thousand dollars in shares of its capital stock. Tournier transferred the formula but never delivered, and complainant never received the equipment. Tournier testified: "I didn't deliver the machine to him [de la Rigaudiere] because I sold him the equipment and formula for the sum of one thousand dollars in shares of stock, but I only received five hundred shares of class A stock and fifty shares of class B stock, which was around six hundred dollars, so there was around four hundred dollars due to me, and I didn't deliver the equipment."

Tournier further testified that he had bought the equipment in France; that the formula was regularly supplied with each purchase of equipment; that the formula was not secret but was known all over France; that it was valueless; that from 1922 to 1924, he, Tournier, had manufactured a beverage from the formula and that he had given it the name "Chamonix," but that he had stopped making it because he didn't know the English language, couldn't

sell the drink, and "lost money on it." Defendants introduced some evidence of prior representations of Tournier which would tend to contradict his testimony as to the secrecy and origin of the formula, but offered no proof of its value.

After weighing the conflicting evidence, I am not persuaded to disbelieve Tournier's testimony. It is consistent with other facts and circumstances, and with Tournier's own acts—his agreement to sell both the formula and equipment for a relatively small amount of stock of a corporation not then organized; and his willingness to deliver the formula, but not the equipment, before he received full consideration. An examination of the formula itself raises serious doubt whether it alone contains sufficient directions to enable anyone to make any certain beverage. It specifies a quantity of "coloring matter" but does not designate any particular color or coloring material. It specifies a quantity of "essence," presumably a flavoring component, but fails to prescribe the kind of essence. Complainant never undertook to do anything with the formula. The directors did not even take the trouble to acquire the equipment with which to make use of it. Certainly no justification is apparent for the great disparity between the price de la Rigaudier agreed to pay Tournier, and the price at which he agreed to sell the same property to the corporation he had organized. The evidence, it seems to me, fairly establishes that the formula had no substantial value.

Defendants correctly assert that under *Section* 14 of the *Delaware Corporation Law*, in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property acquired shall be conclusive; and that consequently, a showing of no more than excessive valuation is insufficient to overcome the conclusiveness of the directors' judgment. But the attending circumstances may constitute a proper basis for a finding of fraud; and inadequacy of consideration may be considered in connection with other facts from which fraud may be inferred.

*McCombs Producing & Refining Co. v. Ogle,* 200 *Ky.* 208, 254 *S. W.* 425. Here, in addition to gross overvaluation, a partial failure of consideration has been demonstrated. The equipment, never received, appears from the testimony of Tournier to be the only part of the consideration which had ʼvalue. The Delaware Constitution contemplates the production of the thing itself and not the mere promise to produce, to justify the issuance of stock as full paid. *Sohland v. Baker,* 15 *Del. Ch.* 431, 141 *A.* 277, 58 *A. L. R.* 693. The issuance of stock as full paid for a consideration never delivered to, nor acquired by the corporation constitutes "actual fraud" within the meaning of *Section* 14 of the *Delaware Corporation Laws. Ellis v. Penn Beef Co., et al.,* 9 *Del. Ch.* 213, 80 *A.* 666. Indeed, the circumstances of this case point to the conclusion that the resolutions and dealings with respect to the formula and equipment were nothing more than a veil to hide the issuance of shares without consideration. There was thus a violation of the constitutional and statutory requirements. *Sohland v. Baker, supra; Blair, et al., v. F. H. Smith Co., et al.,* 18 *Del. Ch.* 150, 156 *A.* 207; *Ellis v. Penn Beef Co., et al., supra.*

All of the shares sought to be cancelled are a part of those originally issued in the joint names of Guy de la Rigaudiere and Camille de la Rigaudiere. Some of the defendants contend with respect to the shares claimed by them that they are *bona fide* purchasers for value without notice or knowledge of any infirmity; and that in consequence the corporation is estopped from denying the recital in the stock certificates that the shares are full paid and non-assessable. The legal proposition urged is supported by *Bowen v. Imperial Theatres, Inc.,* 13 *Del. Ch.* 120, 115 *A.* 918, and is not controverted by complainant. However, one claiming to be an innocent purchaser for value has the burden of proving his claim. *Blair, et al., v. F. H. Smith Co., et al., supra.* With these principles in mind, the stockholdings of the various respondents will be considered separately.

First. 10,000 shares of class A stock registered in the name of Camille de la Rigaudiere. This stock was pledged by the registered holder with Avondale National Bank as security for the payment of a loan made by the bank. It is conceded that Mrs. de la Rigaudiere is not an innocent purchaser for value. On the other hand, complainant agrees that the bank has a valid lien to the extent of money advanced in reliance on such shares, and asks only that any interest of Mrs. de la Rigaudiere in the shares be cancelled.

Second. 45,631 shares of class B stock of which Camille de la Rigaudier is the registered owner. In the bill, complainant prays for the cancellation of 50,631 class B shares registered in the name of this respondent. Indeed, Mrs. de la Rigaudiere stated in an affidavit dated May 11, 1938, and filed in another suit in this court (*Yasik v. Wachtel, ante p.* 247, 17 *A.* 2*d* 309) that she was the owner of this number of shares. She likewise voted them at the stockholders' meeting in February, 1939. It is now contended by the respondents that Mrs. de la Rigaudiere had sold them, 5,000 shares on January 26, 1936, and the remaining 45,631 on March 30, 1938, to the Reverend Sylvester A. Hosinski, defendant herein. Complainant admits that the Reverend Hosinski was an innocent purchaser for value of the 5,000 shares, but denies that he sustained that character as to the 45,631. There is some evidence that the Reverend Hosinski purchased the latter block for an agreed consideration of $10,000, and that he had paid, prior to the institution of this suit on June 25, 1938, a total of $2,500 on account of the purchase price. He testified that he did not know anything about the value of the formula and had no knowledge of any infirmity in Mrs. de la Rigaudiere's title to the stock. However, he also testified that he has been familiar with the affairs of the brewery for some years, and has taken "quite an interest in them"; that he learned about two weeks before the stockholders' meeting in February, 1938, how Mr. de la Rigaudiere acquired the stock originally. On cross-

examination he was asked "When did you first know about some question with reference to the stock of Mrs. de la Rigaudiere?" He answered: "After the stockholders' meeting in 1938." From this it seems only reasonable to infer that he had knowledge of a question relating to the stock before March 30, 1938, the date on which he claims it was transferred to him. What he knew was at least enough to put him on inquiry, which if pursued with due diligence would have revealed the true situation concerning the issuance of the shares. Hence, he has not sustained the burden of showing that he was an innocent purchaser for value.

Third. 35,000 shares of class B stock registered in the names of Guy and Isabelle de la Rigaudiere. These defendants (the married name of the latter is now Mrs. Tunis) are the son and daughter of the promoter and of Camille de la Rigaudiere. In 1934, after the death of their father, each child received, as beneficiary of insurance on his life, a check in the amount of $3,925.15. Thereafter, each check was endorsed by the payee, delivered to the mother, and used by her for her own benefit. The interested parties testified that the delivery of the checks was a loan from the children to the mother; and that in December, 1936, when it appeared that Mrs. de la Rigaudiere would be unable to repay them, they agreed that the son and daughter should accept the 35,000 shares of B stock in payment. Mrs. de la Rigaudiere transferred these shares to her children and a single stock certificate was issued in their joint names on January 25, 1937. There was no writing of any kind to show that the delivery of the checks was a loan, or that the receipt of the shares was in payment or cancellation of an indebtedness. There appears no satisfactory explanation why allegedly separate loans were paid by the transfer of stock jointly to the son and daughter, nor precisely upon what basis the parties determined that 35,000 shares were the proper amount to satisfy the indebtedness.

Without regard to any questions as to the consideration for the transfer of the shares, the registered holders have not demonstrated that they were innocent purchasers. Mrs. Tunis admitted that from 1936 she had taken an active interest in the affairs of the brewery, and as early as that knew that the 35,000 shares were a part of what her father received for the Chamonix formula. Her denials of knowlededge of defects in title may well be considered as no more than refusals to admit any defects. A considerable portion of the testimony of her brother is, to say the least, evasive and unconvincing. Indeed, the demeanor of both on the stand was generally lacking in that quality of candor which may properly be expected of those who seek to make full disclosure of relevant facts. I am unable to conclude otherwise than that the evidence offered falls short of sustaining the claim of these parties.

Fourth. 260 shares of class A stock registered in the name of Isabelle Tunis. Mrs. Tunis testified that she had sold this stock and now owns no class A stock. Since she makes no claim to it, and since it does not appear that the transferee is a party to this cause, no determination need be made with respect to it.

Lastly, defendants insist that the proper remedy is assessment of the unpaid purchase price of the shares rather than cancellation. The rule in Delaware has been stated in *Blair, et al., v. F. H. Smith Co., et al.,* 18 *Del. Ch.* 150, 165, 166, 156 *A.* 207, 213: If the issuance of stock was void, cancellation is the proper remedy; if merely voidable, "then that form of relief is to be adopted which would seem to be most in accord with all the equities of the case." I find nothing in the position of the respondents which would justify allowing them to retain the class B stock in question. Complainant is entitled to relief; it has prayed for cancellation; no reason has been suggested why that form is inadequate from its standpoint. Thus, the prayer should be granted with respect to the B stock. The same may be said

as to the A stock pledged with the bank, except that the bank's interests must not be prejudiced. When a form of decree is presented, the solicitors may suggest provisions appropriate to safeguard the rights of the bank and at the same time to afford relief as to any remaining interest in the shares.

A decree in conformity with this opinion will be advised.