In the Matter of SEMINOLE OIL & GAS CORPORATION.

Civil Action No. 986.

LEAH SACHS,
Plaintiff,

*vs.*

SEMINOLE OIL & GAS CORPORATION, a Delaware corporation, MILE-STONE DRILLING COMPANY, a corporation, JOHN ADDISON, GERALDINE L. DORAN, HERSCHEL GREENBAUM, HARRY D. MENCHER, SUSAN A. SHOTWELL, HUGH P. MULLEN, HERBERT WILLIAMS, JAMES H. R. CROMWELL and ROBERT K. BERRY, Defendants.

*New Castle—February 27, 1959.*

*On Motion for Stay—March 3, 1959.*

248

*Arthur G. Logan* and *Aubrey B. Lank,* of Logan, Marvel, Boggs & Theisen, Wilmington, for plaintiff and petitioner.

*Alexander L. Nichols* and *William S. Megonigal,* of Morris, Nichols, Arsht & Tunnell, Wilmington, for appearing defendants other than Milestone Drilling Co.

*William H. Faulk,* Wilmington, for defendant Milestone Drilling Co.

SEITZ, Chancellor: I first consider the exception of Management and of the Opposition to the Master's conclusion that the proxies solicited by both groups should be counted. Both Management and Opposition renew their contention that in soliciting proxies the opposing group was guilty of material misrepresentations.

The Master's report outlines the more important "misrepresentations" relied upon by the opposing factions. The Master then goes on to say that he assumes without deciding that the identified material employed on both sides was false and misleading in the respects charged. Thereafter he apparently deviated from the assumption and actually concluded that there were misstatements and deceptive innuendos on both sides. Having examined the pertinent evidence I am of the conclusion that both sides were guilty of material misstatements in their proxy material.

The Master concluded that the false and misleading statements of one faction were washed out or cured because of those of the other. The court prefers not to so evaluate the situation. However, my basic reason for agreeing with the Master's conclusion arises from the fact, which the Master also emphasizes, that both sides sent out

numerous letters to the stockholders over a period of several weeks and made charges against and answers to one another which were spelled out at length. While management suggests that the opposition's material of August 28, went out too late for the management to counteract it, I am not satisfied that that document contained material so different from that which had gone before as to work any particular hardship.

It is my view that the court may exercise discretion in determining whether even material misrepresentations made during a proxy solicitation campaign warrant the ordering of a new election. Where, as here, the conflicting claims and answers were presented to the stockholders at length, I think that is a factor which militates against the ordering of a complete resolicitation. This is particularly true since the alleged misrepresentations were pointed out to the solicited stockholders. The economic loss involved in ordering a new election for this comparatively "small" corporation is also entitled to weight. I do not suggest that such an approach is always sound but in a contest where both are guilty and where the issues primarily relate to the fitness of the candidates and thus involve a problem of personal evaluation, it seems to the court that the approach adopted is appropriate.

I therefore conclude that the exceptions of both parties to the Master's decision to count the proxies in question must be overruled.

I now come to the exceptions of the defendant Seminole Oil & Gas Corporation ("corporation") and Milestone Drilling Company ("Milestone") to the Master's conclusion that the stock issued by the corporation to Milestone pursuant to the terms of the so-called Milestone Drilling contract of July 1958 should not be counted insofar as Civil Action 986 is concerned and should be cancelled insofar as Civil Action 1013 is concerned.

The Master concluded that the shares of stock of defendant corporation were not issued for consideration which is legally recognizable under our Constitution and Statute.

Defendant corporation and Milestone suggest that the stock was issued for valid consideration. As I read their brief, they say that it is

found in the continuation of the existing relationship between defendant corporation and Milestone; the fact that the contract replaced and superseded the unperformed obligations of the parties under an earlier agreement, citing *Blish v. Thompson Automatic Arms Corporation*, 30 *Del.Ch.* 538, 64 *A.2d* 581, 598; the obtaining of a financial commitment by Milestone for defendant; and two other unimportant factors.

I think it clear that the mere fact of the continuation of the relationship between defendant corporation and Milestone in and of itself is not legal consideration for the stock under the Delaware law. As to the second ground asserted by defendant, I conclude that the shares were issued at a time when defendant was not confronted with a claim or demand by Milestone under any prior contract which could be said to justify the issuance of stock in lieu thereof at that time. Nor was the stock issued for past services. These factors distinguish the Blish case. The other so-called considerations were not sufficient to support the issuance of the stock, if in fact they were consideration at all.

I conclude that the fair inference from the admissible evidence is that these shares were issued, and Milestone understood that they were being issued, solely for future services.

I therefore conclude that the shares were issued without consideration.

This brings me to the corporation's and Milestone's contention that even if it be found that the shares were issued without compliance with Delaware law as to the type of consideration required, nevertheless, the shares should not be cancelled but Milestone should be entitled to a credit for services subsequently performed.

Prior to the execution of the present agreement, Milestone was well aware that a fight for control of Seminole was in the offing. I am equally sure that Milestone was aware at that time of the fact that the arrangement as finally worked out was motivated at least in part by management's desire to assure itself of control of the corporation. It is a mockery, in the face of this record, to suggest that

the "control" effect of this agreement was merely incidental to its primary business objective.

I recognize that I have discretion in determining the form of relief here and I am also satisfied that the appropriate relief here is to order the shares cancelled. I say this because Milestone does not stand in the position of an innocent third party involved in an arm's length transaction. It is suggested that Milestone has performed in part under the new agreement and is therefore entitled to have such "equities" recognized. The briefing on this point is too sketchy to permit the recognition of such a claim. I will keep the cancellation action open to give Milestone an opportunity to assert such a claim if it desires. If such claims are asserted the court will determine whether Milestone is entitled to a lien.

Since the shares were improperly issued the Master properly refused to count them. I therefore overrule the exceptions of the management to the Master's conclusion that the shares of Seminole obtained by Milestone as a result of the July contract should not be counted.

The court should perhaps take notice of the defendants' charge that the Master relied upon inadmissible evidence in reaching his conclusions. Without pausing to discuss this matter I only say that I feel that the conclusions reached are fully and properly sustained on the basis of clearly admissible evidence.

I should also note that the management spent much of its time developing what it charges is a conspiracy on the part of the opposition to take over and destroy the corporation. I believe the Master adequately disposed of this point. If it is suggested that the general character of some of the members of the Opposition is a reason to resolve the doubt in favor of another court-directed election, the court can only say that from its own evaluation of the record the independent stockholders appear to have been confronted with a possible Hobson's choice. The future looks to be the same.

An order affirming the Special Master's determination as to the identity of the duly elected directors will be entered in Civil Action 986. An order will be entered in Civil Action 1013 giving Milestone

until a fixed future date to assert any "equity" which it claims was created in its favor since and as a result of the execution of the July 10 agreement.

Present orders on notice.

## On Motion for Stay.

This action (Civil Action 986) was commenced as a stockholder's petition for the appointment of a Master to call and hold the annual stockholders' meeting to elect directors. It was brought under 8 *Del.C.* § 224 on the ground that the corporation had failed to call such meeting at the time required by the valid by-law.

The Court appointed a Master for the purpose required and empowered him, *inter alia,* as authorized by 8 *Del.C.* § 227, to determine the right and power of persons claiming to own stock to vote. This he did.

Exceptions to the Master's final report were taken by the original petitioner, Leah Sachs, who is a stockholder, and also by one other stockholder and by four other individuals who voted as proxies for certain stockholders. I think it is fair to say that this group was collectively referred to and identified itself as the Opposition.

Exceptions to the Master's Final Report were also filed by the Seminole Corporation and by "the defendant directors who have appeared herein" which I construe to be John Addison, Herschel Greenbaum, Harry D. Mencher, Hugh P. Mullen and Herbert Williams, at least some of whom were stockholders. This action was consolidated for trial purposes with the cancellation action, in which these directors were defendants. However, in this action, as noted, these directors filed exceptions to the Master's report. Thus, even if we assume that only stockholders who took exception to the Master's report could be heard by this court, the fact is that such directors did in effect become parties under the procedure adopted by them. It is also fair to say that they form part of the group which is described as management.

Insofar as this action is concerned, the court overruled all exceptions and entered a final judgment declaring the so-called Opposi-

tion slate elected. See *In the Matter of Seminole Oil & Gas Corporation (Del.Ch.)*, opinion filed February 27, 1959.

Although exceptions were taken by members of the management as well as by the Opposition, the corporation alone has moved for a stay pending appeal. I assume that the management group is taking a calculated risk with respect to the right of the corporation to appeal, since this matter was called to its counsel's attention prior to the filing of the present motion.

■ The application presents a rather novel problem first because there is some doubt as to the corporation's right, qua corporation, to appeal. Also, as the corporate defendant's counsel points out, if the stay is denied, it will, in effect, prevent an appeal by the corporation since the Opposition will be in control and of course will not appeal. One answer to this problem is to point out that certain individual stockholders in the management group also filed exceptions to the Master's report and it seems clear to this court that they have standing to appeal. But passing over that point, I believe the procedure I suggest will offer the Supreme Court an opportunity to decide whether the corporation has standing to appeal and at what stage its appeal should be evaluated, if at all.

■ I conclude that the corporation's application for a stay pending final determination of the appeal should be denied by this court (even assuming it has standing to appeal) for the following reasons:

(a) Presumably the election of directors' procedure under the statute is to be summary in nature; this matter was commenced April 28, 1958, and the election was held September 8, 1958.

(b) The next annual meeting, under my ruling, will be held in about two months (May) and under normal procedures the appeal "on the merits" in this case will not have been decided by that time.

(c) A denial of a stay will permit an application for a stay to be made to the Supreme Court under *Rule 22(2), Del.C.Ann.* That court can then decide whether the right to appeal and the merits of the appeal should in effect be resolved at that stage or later. Compare

*American Hardware Corp. v. Savage Arms Corp.*, 37 *Del.Ch.* 59, 136 *A.2d* 690.

Since the motion to stay is solely on behalf of the corporation, this court will grant a stay pending the determination of an application for a stay before the Supreme Court under *Rule 22(2)*. This stay will be granted on the condition that application for such a stay is made before the close of business today (March 3). The time to apply will be extended unless the attorney for Leah Sachs et al., as appellees, agrees to accept and acknowledge service under Supreme Court *Rule 5(2)*. The attorney for Sachs et al. should communicate his decision to opposing counsel forthwith.

In connection with this application, I have not deemed it appropriate to refer again to my views on the merits. Such an approach here would be trial court boot-strap lifting of a high order.

Defendants' counsel also emphasizes the alleged undesirability of shifting management until the appeal is decided, particularly in view of the issues to be decided. If the Master and the court are correct, the management should have been replaced some months ago. Whether they should have been replaced is, in the event of an appeal, for the Supreme Court to say. Under the circumstances mentioned, it is for the Supreme Court to prevent a shift if they deem that course appropriate. However, to further preserve the status quo I will, as a condition to the denial of a full stay, require the prospective appellees to consent to the entry of an order restraining the payment of expenses incurred in connection with this action until further order of this court.

If the corporation desires to pursue the course herein outlined it should present a form of order on notice before 3:30 p. m. today, otherwise the pending motion will be denied absolutely.

NOTE: An application for a stay was subsequently made to a Justice of the Supreme Court. It was denied without a reported opinion.

FINAL REPORT OF SPECIAL MASTER.

(Civil Action 986, 1958.)

The Report of Daniel L. Herrmann, Special Master appointed in the above entitled cause by Order of this Court entered on August 1, 1958, respectfully represents:

I. This Final Report is filed after advance copies thereof were furnished to counsel of record and after due consideration of exceptions filed thereto.

II. On September 26, 1958, the Draft Report attached hereto was submitted to each party of record for inspection pursuant to *Rule 144 of this Court. Del. C.Ann.*

III. Exceptions to the Draft Report were filed by the parties on October 9, 1958.

IV. Hearing upon the exceptions were held during the period December 15, 1958 through December 24, 1958. The lapse of time between the filing of the exceptions and the hearings thereon was caused principally by extensive depositions conducted by Management in New York and Texas.

V. All exceptions to the Draft Report have now been abandoned except the following:

A. Management's exception that all proxies voted by Opposition should be excluded from the count on the ground that certain of the Opposition's proxy solicitation material was false and fraudulently misleading.

B. Opposition's exception that all proxies voted by Management should be excluded from the count on the ground that certain of the Management's proxy solicitation material was false and fraudulently misleading.

C. Opposition's exception that 283,000 shares of common stock, voted for Management by William H. Foulk, Esquire, as proxy for Milestone Drilling Company, should not have been counted because

the issuance of the said 283,000 shares to Milestone Drilling Company was illegal and void.

VI. I have concluded that the exception of both sides regarding false and misleading proxy solicitation material should be overruled.

A. The Management proxy solicitation statements most vigorously attacked by the Opposition as being false and misleading were:

1) That the record in the New York Court of Appeals shows that Theodore Landeau, Secretary of the Stockholders' Protective Committee, is a front for Milton J. Shuck, alleged to be a person of disreputable character for the reason stated therein; that others in Shuck's group tried to defraud Seminole into buying worthless property and that they resorted to slandering the credit of the company.

2) That, according to independent geological reports, Seminole's oil reserves would be increased by $500,000 by reason of the Milestone contract.

3) That legal action of the Board of Directors was taken from time to time without participation of Mrs. Margaret Richardson.

4) That the Stockholders' Protective Committee, Mrs. Richardson, Philip Goodkin, Peter Mencher, Leah Sachs, Emanuel Lewis Greene, Herbert E. Berger and Theodore Landeau are all tools and fronts for Milton J. Shuck and are attempting to obtain control of Seminole so that Shuck and they may exploit it for their personal gain.

B. The Opposition proxy solicitation statements most vigorously attacked by Management as being false and misleading are these:

1) Erroneous interpretations of the decision of the Court in this cause adverse to Management's position.

2) That the Milestone transaction was a $650,000 "giveaway".

3) That the Opposition slate is expert in the oil business.

4) That Seminole was being mismanaged and exploited by Management and, in particular, by H. D. Mencher and John Addison.

5) That H. D. Mencher is an adjudicated bankrupt.

6) That the Stockholders' Protective Committee represents 200,-000 shares.

7) That the Opposition had a bona fide bid to do the Milestone drilling project for $175,000.

C. Assuming, without deciding, that the statements objected to in the proxy solicitation material of both sides were false and misleading, it is my opinion that the objectionable statement of one faction "wash out" or "cure" those of the other.

This was a prolonged and bitter proxy campaign conducted by men who had become imbued with a very personal animosity one for the other. Against such background, both "verbal niceties" and "permissible puffing" (compare *Kerbs v. California Eastern Airways, Inc.,* 33 *Del.Ch.* 395, 94 *A.2d* 217) were abandoned and the stockholders were caught in a cross fire of unrestrained charges, countercharges and recriminations. Certain statements on both sides were reprehensible, in my opinion, but not sufficiently so as to warrant the disenfranchisement of all stockholders who gave their proxies to one group or the other. Only the most flagrant fraud and deception by a soliciting faction will justify the disenfranchisement of a large group of stockholders whose only offense was that they were the possible victims of the fraud perpetrated. See *Aranow & Einhorn "Proxy Contests for Corporate Control",* pp. 437-438, 468-469. I do not find that degree of deception on either side here.

Numerous letters and statements to stockholders were issued by both factions over the period of several weeks. Each faction availed itself fully of the opportunity to present to stockholders its side of the controversy surrounding the charges. The stockholders have been furnished with both versions of the alleged misstatements. It may be assumed that, having been bombarded with such full presentation of both sides of the story, the stockholders have expressed their choice as intelligently and as democratically as is possible under our proxy system of corporate elections. See *In re R. Hoe & Co., Inc., Sup.,* 137 *N.Y.S.2d* 142, affirmed 285 *App.Div.* 927, 139 *N.Y.S.2d* 883; 309 *N.Y.* 719, 128 *N.E.2d* 420.

I conclude that, although there were misstatements and deceptive innuendo on both sides in this strenuous and heated proxy struggle, the circumstances do not warrant judicial interference by disenfranchisement of large groups of stockholders or by setting the election aside. Compare *Atterbury v. Consolidated Coppermines Corp.*, 26 *Del.Ch.* 1, 20 *A.2d* 743.

Something more must be stated regarding the conspiracy charge brought by Management against Opposition. Management charges that the Opposition group is banded together in order to place in control men who are disreputable and who intend to exploit the company for their personal gain. The Opposition, on the other hand, charges Management with exploitation, past and present.

The Court will not heed charges and countercharges concerning the fitness of either of the contesting groups to manage the company. The relative merits of the contending factions struggling for control is a matter for the stockholders to decide and is not for judicial determination in a proceeding of this nature. This is the law of the case. See also *In re Gulla*, 13 *Del.Ch.* 23, 26, 115 *A.* 317, 318; *McWhirter v. Washington Royalties Co.*, 17 *Del.Ch.* 243, 152 *A.* 220. Moreover, the proper remedy against the exploitation of a corporation is by an appropriate action to redress the wrongs, if and when done, and not by an effort in a proceeding such as this to prevent the acquisition of such control as might make exploitation possible. See *Francis v. Medill*, 16 *Del.Ch.* 129, 141 *A.* 697.

For these reasons, it is concluded that the exceptions of both sides regarding proxy solicitation statements should be overruled.

VII. The Opposition's exception to the voting of 283,000 shares of common stock by Milestone Drilling Company should be sustained.

The issuance of 283,000 shares of common stock to Milestone Drilling Company (hereinafter "Milestone") was illegal and void because such stock was not issued for "money paid, labor done or personal property, or real estate or leases thereof actually acquired by such corporation" as is required by *Delaware Constitution, art. IX, Sec.* 3, *Del.C.Ann.*, and 8 *Del.C.* § 152.

The foregoing conclusion is based upon the following findings of fact:

A. By contract dated September 13, 1957, as amended, Seminole and Milestone entered into an agreement for the drilling of oil wells on properties held by Seminole in Crane County, Texas, under the W. P. Edwards Lease.  Under the terms of that contract:

1) Seminole elected to be a working interest owner and to pay to Milestone ¼th of the drilling costs on an invoice basis. The other ¾ths of the drilling costs would be paid by Milestone.

2) Milestone would own ¾ths of the gross production of the wells drilled and completed (after accounting to Edwards the Lessor for his ⅛th interest) and Seminole would own ¼th thereof until Milestone had recovered the ¾ths of the drilling costs invested by it, whereupon Milestone and Seminole would own the proceeds equally.

3) Seminole's share of costs would not exceed (a) $5,000 for any well which failed to produce and was abandoned as a "dry hole" or (b) $10,000 for a producing well.

4) Milestone received an undivided ½ interest in the leasehold owned by Seminole under the Edwards Lease.

5) By virtue of letter agreement dated August 23, 1957, it was understood that Milestone had the option to take common stock of Seminole from time to time "in lieu of cash for the costs then chargeable to Seminole".

B. In January 1958, Milestone accepted 17,345 shares of Seminole stock in payment of Seminole's ¼ shares of the costs of drilling one well, such work having been performed when the stock was issued. Seminole's share of the costs of other wells was paid in cash after the work was performed.  Seminole guaranteed the value of the stock thus issued and Milestone agreed to vote such stock for Management at a stockholders' meeting then scheduled to be held in May 1958.

C. By the end of February 1958, Milestone had temporarily completed its drilling commitments under the contract of September 13, 1957 and was not obliged to go forward with further operations until July 1958.

D. By letter dated June 13 and June 16, 1958, Milestone and Oil & Gas Property Management, Inc., Seminole's operating agency, recommended to Seminole that further drilling by Milestone on the Edwards property be postponed pending certain experimental and remedial work on Well No. 7-M in order that further drilling operations on the Edwards property would not be just "flying blind".

E. On June 21, 1958, Harry D. Mencher, President of Seminole, and H. L. Brinson, President of Milestone, met in Chicago at Mencher's suggestion of June 19, 1958 and agreed in principle upon a plan for the further development of the Edwards property and the means of financing such new operations. The plan was reduced to a written memorandum which became the basis for the contract of July 10, 1958 between Milestone and Seminole.

F. At that time, Harry D. Mencher knew that he was confronted with a proxy contest and he knew that control of the company was at stake. This contest was due to be settled at a stockholders' meeting then scheduled to be held on August 4, 1958 with voting by stockholders of record as of July 14, 1958.

G. By contract dated July 10, 1958, Seminole and Milestone implemented the Chicago plan of June 21 and agreed as follows:

1) Milestone would commence remedial work on Well No. 7-M within 30 days after execution of the contract. Within 30 days after the completion of that work, Milestone would commence the plugging of 5 existing wells and, in their place, Milestone would drill and complete 5 new wells. Milestone would also drill 2 new wells on other parts of the property, making a total of 7 new wells to be drilled.

2) The drilling program would be continuous with no more than 30 days between the completion of one well and the commencement of another.

3) Milestone would pay all costs and expenses of this drilling and development program.

4) Milestone would receive a ½ undivided interest in practically all of the Edwards Leasehold not previously assigned to Milestone.

5) Milestone would receive personal property salvaged from existing wells.

6) Milestone would receive forthwith 283,000 shares of the common stock of Seminole under the following terms and conditions:

(a) Seminole guarantees the market price at 50¢ per share as at December 31, 1961, this guarantee secured by a deed of trust and chattel mortgage on the subject properties and an assignment of Seminole's share of the proceeds.

(b) Milestone to arrange bank credit of $115,000 for Seminole to be repaid in monthly installment of $5,000 per month, with interest, or 70% of the proceeds of the subject properties, whichever is lesser.

(c) The first $1,500 of monthly proceeds, after the deduction of the monthly installment due the bank, to be credited by the bank to Seminole's account but be paid over to Milestone.

(d) As of December 31, 1961, or other date agreed upon, Milestone has the option to

(i) Pay to Seminole the amount theretofore credited to Seminole's account and retain the stock; or

(ii) Sell the stock on the open market and, if the proceeds aggregate less than 50¢ per share, pay to Seminole the amount theretofore credited to Seminole's account less the difference realized by Milestone; but if the aggregate proceeds equal or exceed 50¢ per share, to pay to Seminole the full amount theretofore credited to Seminole's account.

(e) The 283,000 shares were to be held in a voting trust, together with other stock held by Mencher and Addison, with Harry D. Mencher, John Addison, the Secretary of Seminole, and Homer L. Brinson as voting trustees.

7) Milestone was to be operator in place of Oil & Gas Property Management, Inc., at the same rate of pay under a form Operating Agreement attached to the contract.

8) Under a provision of such Operating Agreement, Milestone elected "to receive the costs, namely $151,500., payable in advance".

H. The number of 283,000 shares was arrived at by the parties as follows:

| | |
|---|---:|
| ½ cost drilling 7 wells | $140,000. |
| ½ cost remedial work Well No. 7-M | 5,500. |
| | $145,500. |
| Less: Salvage value | 10,000. |
| | $135,500. |
| Interest charge for $135,500. | 6,000.* |
| | $141,500. |
| 283,000 shares @ 50¢ | $141,500. |

\* The parties actually agreed upon an interest charge to Seminole of $12,000 but this was inadvertently divided in half with the other items.

I. The Voting Trust Agreement contemplated by the July 10 contract has not been implemented by deposit of the stock.

J. Harry D. Mencher rushed the implementation of the contract of July 10 and the issuance of the stock to Milestone thereunder so that the stock would be registered by July 14, the deadline for the August 4 stockholders' meeting.

K. The stock was issued on or before July 14, 1958 and was transmitted to Milestone on July 17, 1958. Prior to the issuance of the 283,000 shares, there were issued and outstanding approximately 600,000 shares of common stock.

L. Milestone is not performing under the July 10 contract. It is awaiting the outcome of the litigation now pending in this Court regarding the validity of the subject stock.

I conclude from the foregoing that (1) the issuance of the 283,000 shares to Milestone was for work to be done by Milestone in the future (as was testified to by Brinson); or (2) such stock was issued to Milestone as security ("in lieu of a note" according to Brinson or "in lieu of a deposit in escrow" according to Mencher) for moneys to be advanced by Milestone in the future on Seminole's behalf; i. e., a ½ share of the drilling costs to be incurred in the future.

In either event, it is clear that the stock was not issued for "money paid, labor done or personal property, or real estate or leases thereof actually acquired" by Seminole in accordance with the constitutional requirement. See *Scully v. Automobile Finance Co.*, 12 *Del.Ch.* 174, 109 *A.* 49; *Bowen v. Imperial Theatres, Inc.*, 13 *Del.Ch.* 120, 115 *A.* 918; *Diamond State Brewery v. De La Rigaudiere*, 25 *Del.Ch.* 257, 17 *A.2d* 313; *Cahall v. Lofland*, 12 *Del.Ch.* 299, 114 *A.* 224; *Riegel v. Only Package Pie, Inc.*, 14 *Del.Ch.* 356, 128 *A.* 110.

Management contends that the issuance of the stock meets the requirements of the Constitution and the Statute because (1) Seminole is relieved of its contingent liability under the September 1957 contract to advance ¼th of the drilling costs when Milestone resumed drilling operations; (2) Milestone obtained $150,000 line of credit for Seminole; (3) Milestone was substituted for Oil & Gas as Operator; and (4) Seminole has the use of Milestone office facilities.

I cannot agree that these considerations validate the stock. When the July 10 contract was negotiated, Milestone was seeking waiver of the 1957 contract and was urging postponement of further drilling operations thereunder until experimental work on Well No. 7-M could be completed. Seminole was not confronted with any claim or demand by Milestone under the 1957 contract that could not have been met by the issuance of stock *after* the work was done. Assuming the receipt of the other benefits mentioned and the reasonableness of the issuance of 283,000 shares therefor, the fact remains that the stock was issued *before* such benefits were rendered and received.

For these reasons, I have concluded that the 283,000 shares of common stock voted by William H. Foulk, Esquire, as proxy for Milestone Drilling Company must be rejected and not counted.

VIII. As the result of the foregoing conclusion, the Report of the Tally Clerks, Exhibit C to the Draft Report attached hereto, is hereby amended to eliminate 283,000 votes of the 385,945 votes tabulated in Paragraph 2 thereof.

IX. The consolidated tabulation of the results of the voting as thus amended, is as follows:

Common Stock

| | Number of Votes |
| --- | --- |
| John Addison | 251,754 |
| Robert K. Berry | 251,754 |
| James H. R. Cromwell | 251,754 |
| Harry D. Mencher | 251,754 |
| Jack Singleton | 251,754 |
| Herman Bayern | 251,754 |
| Emanuel Lewis Greene | 347,843 |
| Herbert E. Berger | 347,843 |
| William L. Nolan | 347,843 |
| Jack Sachs | 347,843 |
| Sol Smith | 347,843 |
| Theodore A. Landeau | 347,843 |

Preferred Stock

| | |
| --- | --- |
| Hamilton Mencher | 2,685 |
| Dale O. Chase | 2,685 |
| Herbert Williams | 2,685 |
| Leroy E. Rodman | 3,709 |
| John R. Maher | 3,709 |
| Margaret Richardson | 3,709 |

X. In accordance with the votes thus cast and counted, it is recommended that the following persons be declared duly elected on September 8, 1958, as Directors of Seminole Oil & Gas Corporation to hold office until the next annual meeting of stockholders of the corporation or until their successors are duly elected and qualified:

Emmanuel Lewis Greene
Herbert E. Berger
William L. Nolan
Jack Sachs
Sol Smith
Theodore A. Landeau
Leroy E. Rodman
John R. Maher
Margaret Richardson

XI. The attached Draft Report is amended in accordance with the foregoing but is otherwise confirmed.

FINAL REPORT OF SPECIAL MASTER.

(Civil Action 1013, 1958.)

The Report of Daniel L. Herrmann, Special Master appointed in the above entitled cause by Order of this Court entered on September 25, 1958, respectfully represents:

1) For the reasons stated in Paragraph VII of the attached Report filed in Civil Action 986, 1958, with which this cause was consolidated for trial and determination, it is recommended that a decree be entered cancelling the 283,000 shares of common stock of Seminole Oil & Gas Corporation which were issued to Milestone Drilling Company on or about July 14, 1958.

2) It is recommended that the counterclaim filed herein be dismissed for failure of the defendants to prove damages.

3) The Second, Third and Fourth Causes of Action set forth in the complaint and the Second and Third Affirmative Defenses set forth in the answer have been abandoned by the parties.